CITIZENS TO PRESERVE OVERTON PARK, INC., et al., Original Plaintiffs,

and

Sierra Club et al., Intervening Plaintiffs,

v.

John A. VOLPE, Secretary, Department of Transportation, and Charles W. Speight, Commissioner, Tennessee Department of Highways, Original Defendants,

and

City of Memphis et al., Intervening Defendants.

Civ. No. C–70–17.

United States District Court,
W. D. Tennessee, W. D.

Jan. 5, 1972.

John W. Vardaman, Jr., Williams, Connolly & Califano, Washington, D. C., Charles F. Newman, Burch, Porter & Johnson, Memphis, Tenn., for original plaintiffs Citizens to Preserve Overton Park, Inc., Deupree and Snyder.

Michael R. Lackner, Memphis, Tenn., Paul Henry Kidd, Monroe, La., for plaintiff Sunshine Snyder.

H. Donald Harris, Jr., San Francisco, Cal., John W. Vardaman, Jr., Washington, D. C., and Charles F. Newman, Memphis, Tenn., for Sierra Club.

Donald C. Hays, New York City, John W. Vardaman, Jr., Washington, D. C., and Charles F. Newman, Memphis, Tenn., for National Audubon Society: (plaintiff)

John W. Vardaman, Jr., Washington, D. C., and Charles F. Newman, Memphis, Tenn., and Robert M. Kennan, Jr., Washington, D. C., for plaintiff National Wildlife Federation.

Thomas F. Turley, Jr., U. S. Atty., James N. Raines, Asst. U. S. Atty., David C. Porteous, Asst. U. S. Atty., Memphis, Tenn., for defendant Volpe.

David M. Pack, Atty. Gen., of Tennessee, Lurton C. Goodpasture, Jr., Asst. Atty. Gen., Nashville, Tenn.; J. Alan Hanover, James B. Jalenak, Hanover, Walsh, Barnes & Jalenak, Memphis, Tenn., Special counsel, for defendant Speight.

Dale Woodall, Evans, Petree, Cobb & Edwards, Memphis, Tenn., for intervening defendants City of Memphis, Memphis Chamber of Commerce, Future Memphis, Inc., and Downtown Association.

## MEMORANDUM DECISION

BAILEY BROWN, Chief Judge.

This is an action to enjoin the Secretary of Transportation from releasing federal funds to the Highway Department of the State of Tennessee for construction of a segment of an interstate highway through Overton Park in Memphis. This Court granted summary judgment for defendants. 309 F.Supp. 1189 (1970). The Court of Appeals for the Sixth Circuit affirmed. 432 F.2d 1307 (1970). The Supreme Court reversed and remanded for a plenary review of Secretary Volpe's approval of the release of federal funds for this project in November, 1969. 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This hearing has since been held. The background of this litigation is fully set out in those opinions.

In its opinion, the Supreme Court gave a narrow interpretation to the requirement of § 4(f) of the Department of Transportation Act of 1966 (49 U.S.C.A. § 1653(f)) [1] that the Secretary not re-

---

[1] § 4(f) provides: "It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use." 49 U.S.C. § 1653(f) (Supp. V).

There is an identical provision in § 138 of the Federal-Aid Highway Act of 1968, 23 U.S.C.A. § 138. Hereinafter we will refer only to § 4(f).

lease funds for the construction of a highway using public parkland unless there is no "feasible and prudent" alternative. It held that, while such factors as cost, directness of route and community disruption were not to be ignored, the purpose of this provision was to give "protection of parkland . . . paramount importance." 401 U.S. at 412–413, 91 S.Ct. 814.[2] It held that an alternative route is "feasible" within the meaning of this provision unless its use would be contrary to "sound engineering." 401 U.S. at 411, 91 S.Ct. 814. And it further held that an alternative route is "prudent" within the meaning of this provision unless its use involved "truly unusual factors" or its use involved "cost or community disruption . . . [of] extraordinary magnitudes." 401 U.S. at 413, 91 S.Ct. at 822. Although there is a proviso in § 4(f) that would appear to make the provision applicable only if the local officials having jurisdiction of the park determined it to be of local significance for § 4(f) purposes, the opinion gave no such effect to this proviso; indeed, the opinion implicitly holds that the fact that local officials in Memphis had approved this route through Overton Park could not properly be given any weight by the Secretary in making his determination.[3]

Having so interpreted § 4(f) of the Act, the Supreme Court further held (401 U.S. at 413, 91 S.Ct. 814) that, since there is "law to apply" by the Secretary, his determinations are reviewable under the Administrative Procedure Act (5 U.S.C.A. § 701 et seq.) and proceeded to determine the standard for review. It concluded that the determination is not to be reviewed de novo and not even to be subjected to the "substantial evidence" standard. 401 U.S. 414–415, 91 S.Ct. 814. It held, however, that, while the Secretary's determination is entitled to a presumption of regularity, this court, in reviewing his de-

termination, must "engage in a substantial inquiry . . . [which is] thorough, probing, in-depth . . ." (401 U.S. at 415, 91 S.Ct. at 823), and the opinion then explicitly spells out the standard for our review as follows:

"The court is first required to decide whether the Secretary acted within the scope of his authority. [Citation omitted.] This determination naturally begins with a delineation of the scope of the Secretary's authority and discretion. [Citation omitted.] As has been shown, Congress has specified only a small range of choices that the Secretary can make. Also involved in this initial inquiry is a determination of whether on the facts the Secretary's decision can reasonably be said to be within that range. The reviewing court must consider whether the Secretary properly construed his authority to approve the use of parkland as limited to situations where there are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems. And the reviewing court must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems.

"Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2) (A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2) (A) (Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." [Citations omitted.] 401 U.S. at 415–416, 91 S.Ct. at 823.

---

2. See comment on this aspect of opinion in The Supreme Court, 1970 Term, 85 Harv.L.Rev. 315 (1971) at 323–325.

3. *Id.*, at 324.

We believe that the foregoing language of the Supreme Court's opinion should be interpreted and may be paraphrased as follows. The first question to be answered is the question whether the Secretary acted within the scope of his authority. To answer this question it is necessary, in turn, to answer two subsidiary questions. The first of these is: did the Secretary properly construe his authority, that is, did he apply the correct legal standard, as such is set out in the opinion, in determining whether there was a feasible and prudent alternative. The second of these is: could the Secretary have reasonably believed, considering the information and materials he had before him, that there was no such feasible and prudent alternative. Here we must consider both the content and the completeness of the information and materials before the Secretary. In order to determine that the Secretary acted within the scope of his authority, we must answer both of these subsidiary questions in the affirmative.[4] If we determine that the Secretary acted within the scope of his authority, we must also determine whether the actual choice made was arbitrary, capricious or an abuse of discretion. Here we must consider whether, in making the choice, the Secretary actually considered the factors held by the Court to be relevant and if so whether, in giving weight to the factors as prescribed by the Court, he committed a clear error of judgment.

Although the opinion of the Supreme Court, as has been seen, admonished us to conduct a thorough plenary hearing and explicitly set out the determinations that we are to make, the opinion adds this *caveat:* "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 824.

The Supreme Court held that, contrary to the contention of plaintiffs, the failure of the Secretary to make formal findings and state his reason for his approval does not require a remand to him. 401 U.S. at 417–419, 91 S.Ct. 814. The Court also held, however, that it was improper to base our review, as we did when we granted summary judgment, on the litigation affidavits with exhibits and that the basis for review should be the " 'whole record' compiled by the agency: the basis for review required by § 706 of the Administrative Procedure Act." 401 U.S. at 419, 91 S.Ct. at 825.

Thus the Court held that the case must be remanded to this court for plenary review of the Secretary's decision, "[the] review . . . to be based on the full administrative record that was before the Secretary at the time he made his decision." 401 U.S. at 420, 91 S.Ct. at 825. It pointed out, however, that the "bare record may not disclose the factors that were considered or the Secretary's construction of the evidence . . .," and that therefore testimony of the persons involved in making the decision might be necessary. 401 U.S. at 420, 91 S.Ct. at 825. Such inquiry into mental processes, the Court said, should ordinarily be avoided, and where there are formal findings and reasons stated in support thereof at the time the decision is made, there must be clear proof of bad faith or other improper conduct before the mental processes of the agency people may be investigated. The Court pointed out that the Secretary could even later make formal findings that might provide a sufficient explanation of his decision, but such findings would, like the affidavits before the Court on motion for summary judgment, have the aspect of a "post hoc rationalization" which must be reviewed in that light. Lastly the Court said that if the trial court decided that "additional explanation" is

---

4. We will deal later in this opinion with defendants' contention that, even if the Secretary did not apply the correct standard, this matter need not be remanded to him if, applying the correct standard, the record supports his approval.

necessary, it should decide "which method will prove the most expeditious so that full review may be had as soon as possible." 401 U.S. 420–421, 91 S.Ct. 826.

A short while after the decision of the Supreme Court came down on March 2, 1971, we met informally with counsel for the parties to discuss the future course of this case. Counsel for the Secretary indicated that it would require at least six weeks to assemble the administrative record, and that when this was accomplished, it would be filed. (It actually was not filed until July 14, 1971). Counsel for the plaintiffs then stated that they would want to take some discovery depositions after the record was filed. Defendants objected to this, contending that the first inquiry should be to determine whether the Secretary's decision could be reviewed on the bare administrative record alone and that, if so, such discovery would be unnecessary. We concluded, however, and so indicated to counsel, that plaintiffs were at the very least entitled to discovery to determine whether the record as filed was complete. At that time it was not known to counsel whether the Secretary would prepare and file formal findings. We therefore also indicated to the parties, in line with our interpretation of the Supreme Court's opinion, that plaintiffs should be allowed, in taking the discovery, to explore the mental processes of the agency people, including the Secretary, and that we would later decide to what extent such proof would be admissible at the hearing. The Secretary has never prepared and filed formal findings,[5] so, again in line with our interpretation of the Supreme Court's opinion, we admitted in evidence at the plenary hearing testimony having to do with the mental processes of the persons involved in making the decision, including the deposition of the Secretary.

At a formal pre-trial conference on September 7, 1971, we ruled that plaintiffs would be entitled to offer expert testimony to evaluate the investigation of alternative routes by the Secretary. We so ruled because we thought expert testimony would be competent as an aid to the court in evaluating the expertise exercised by the Secretary and his associates. We also at that time ruled that plaintiffs could offer expert proof to show that there were in fact feasible and prudent alternative routes. Our theory in so ruling was that, so far as we judicially knew, there could be an obviously feasible and prudent alternative and that if such could be shown, it would undercut the good faith of the administrative investigation, particularly if it in no wise appeared in the administrative record.

We further ruled, at this pre-trial conference, that defendants would not be entitled to show the amount of money that would, so to speak, go down the drain with an abandonment of the route through the park. We so ruled because it was dramatically clear at the time of the Secretary's determination in November, 1969 and at the time of the presentation of this case in the Supreme Court that condemnation of land and removal of buildings was almost complete on the park route and yet the opinion of the Court, while recognizing that the cost of alternative routes could properly have been considered, omits this as a proper factor for consideration when the Secretary made the decision. A question that is related to the foregoing one and was not ruled on at the pre-trial conference is the question whether the Secretary, in weighing the community disruption factor in making his determination, could properly consider the fact that the disruption on the park route had already occurred while disruption on another route would be new and additional. We reserved this question at the plenary hearing. On reflection, we are of the opinion that, since these facts were likewise dramatically

---

5. The Secretary filed an affidavit dated July 15, 1971 on July 22, 1971, but his counsel expressly stated, on inquiry from this Court, that such was not to be treated as formal findings within the meaning of the Supreme Court's opinion.

clear when the Secretary made his decision and when the Supreme Court heard this case and since the opinion, while recognizing that the disruption that would be caused by use of alternative routes could properly have been considered, omits this as a proper factor for consideration, these facts could not properly be considered by the Secretary in making his decision.

The plenary hearing began on September 27 and terminated on November 4, 1971, consuming twenty-five trial days, and 240 exhibits were admitted in evidence. We believe that it can fairly be said that the inquiry was substantial, thorough, probing, in-depth, searching and careful. We have also had the benefit of 287 pages of post-trial briefs.

With respect to the route of the interstate highway through Overton Park, it is one of plaintiffs' contentions that Secretary Volpe, whose November, 1969 determination we are reviewing under the specific direction of the remand decision of the Supreme Court, did not actually consider any alternative routes to the park route for the purpose of making that determination. It is the Secretary's memory that he did, as he states in the affidavit dated July 15, 1971 and in his deposition taken on August 31, 1971. However, we find that, whether or not we consider the affidavit and deposition as a "post hoc rationalization," the evidence is overwhelming that Secretary Volpe did not so consider alternatives. In the first place, it has been the position of Secretary Volpe through counsel in this court that his approval of the park route was unnecessary since it had been approved by Federal Highway Administrator Whitten in 1966 (before § 4(f) was enacted) and, more particularly, since it has been approved by Secretary Boyd, Volpe's predecessor in office, in April, 1968 pursuant to § 4(f). Secondly, the public hearing held by the Federal Highway Administration in Memphis in May, 1969 was, as has been correctly contended by Secretary Volpe in this litigation, only a design hearing and was not also a route hearing. Thirdly, it is without dispute here that in this case the Solicitor General of the United States argued in the Supreme Court that Secretary Volpe's November, 1969 determination was a design approval but not a route approval. Fourthly, J. D. Braman, who was Assistant Secretary of Transportation for Environment and Urban Systems under Volpe, testified that, while he frequently advised with the Secretary on § 4(f) matters, he was never asked to investigate alternatives to the park route and understood that this matter was foreclosed by prior decisions and actions. Oscar Gray, an attorney in the Department whose concern was environmental matters, supported Braman with his testimony. Fifthly, there is not a document in the administrative record that indicates that Secretary Volpe considered and ruled out route alternatives. Sixthly, even Secretary Volpe's announcement of his decision on November 5, 1969 (which is in the form of a press release) indicates on its face that the Secretary was merely reaffirming a prior route determination and that he had only considered design alternatives. This press release states in part:

"Secretary of Transportation John A. Volpe today announced he has approved, with significant qualifications, a proposal submitted by the Tennessee Department of Highways to construct a segment of Interstate Route 40 through Overton Park in Memphis, Tennessee.

"Secretary Volpe said a 'hold' on the project had been lifted after the state agreed to adjust the grade line of the depressed freeway to a point as low as possible. This grade line would still permit natural drainage in the area of Lick Creek, a small stream that flows through the 360 acre park near downtown Memphis.

"J. D. Braman, Assistant Secretary of Transportation for Environment and Urban Systems, and one of Secretary Volpe's key advisors on environment and downtown highway systems, said, 'The plan for Overton Park is the most

reasonable now open to us and is designed to do minimum damage to the park. The options of this Administration were few, mainly because the route of the highway had previously been determined.' "

Thus we conclude that, because of approval by Secretary Boyd[6] and because of the acquisition and clearing of the park route before he took office, Secretary Volpe thought that it was at least very doubtful that he had any legal power to choose an alternative route and that in any event as a practical matter he could not choose an alternative route.

Since we have concluded that Secretary Volpe did not determine at all that there was no "feasible and prudent" alternative as, the Supreme Court's opinion makes clear, he was required to do, we would for this reason alone have to remand this matter to him to make such determination. There is, however, another reason why this matter must be remanded. This reason is that, even if it could be said that Secretary Volpe made a determination that there was no "feasible and prudent" alternative to the park route, it is clear that he did not give these words the interpretation that the Supreme Court did and that therefore he did not apply the correct legal standard. The Secretary's position is that he applied a standard that was the same or substantially the same as that laid down by the Supreme Court.

In this connection, it should first be pointed out that the Supreme Court's interpretation of § 4(f) is contrary to what the Department of Transportation and its Secretary must have expected it to be. As we have already indicated, the Court has by its interpretation narrowly limited the choices of the Secretary. In doing so, as we have also already indicated, the Court gave no effect to the proviso in § 4(f) having to do with decisions by local officials. The

Court further, in so construing the provision, expressly declined to accept the Secretary's argument that the requirement in § 4(f) that the alternative be a "prudent" one allowed him to balance competing interests and to weigh the detriment to the park against the disadvantages of avoiding the park and then determine whether, on balance, the alternative route was a "prudent" one. "[N]o such wide-ranging endeavor was intended." 401 U.S. at 411, 91 S.Ct. at 821. In so interpreting § 4(f), the Court "felt it necessary to focus only on the language of the statutes to determine legislative intent." The Supreme Court, 1970 Term, 85 Harv.L.Rev. 315 (1971) at 325. It gave little, if any, weight to Congressional Committee reports. *Id.,* at 325, footnote 54. And it did not deal with the complex policy issues in construing § 4(f). *Id.,* at 324.

There are other indications in the record that Secretary Volpe did not apply the correct standard. In his deposition, Volpe did not indicate that he had understood at the time he made the decision in November, 1969, that § 4(f) had the meaning that the Supreme Court has given it. In his affidavit, the Secretary does say that, applying the correct standard as laid down in the Supreme Court's decision, he would have concluded that there was no feasible and prudent alternative to the park route, but he does not say that he applied such a standard when he made the decision. Moreover, the Secretary's position in this court when this case was first before us and his position in the Supreme Court was that he was indeed entitled, under § 4(f), to balance the detriment to the park against the disadvantages of a route that would avoid the park. There is nothing in the administrative record to indicate that anyone in the Department of Transportation in 1969 had any notion that § 4(f) so narrowly constricted the Secretary's options. The

---

6. As will be seen, defendants cannot effectively fall back upon the route determination made by Boyd, not only because the Supreme Court has directed us to review Volpe's determination as the operative one, but also because Boyd's determination was itself based on an incorrect legal standard.

record is clear that Secretary Boyd, when he approved the park route in April, 1968, gave very great weight to the fact that the route had been approved by the City Council of Memphis, which, in the light of the wording of § 4(f) and the legislative history, is certainly understandable, but as we have seen, no weight may be given to the fact of approval by local officials.

Thus we must reach the conclusion that Secretary Volpe, if he did consider alternatives to the park route, must have, however understandably, applied an incorrect standard.

Defendants contend that, even if the Secretary applied an incorrect standard in determining that there was no feasible and prudent alternative, this matter need not for this reason be remanded to him if his decision is supportable, applying the correct standard, by the administrative record. In this connection, defendants point out that, in its opinion, the Court said that this court "[M]ust *consider* whether the Secretary properly construed his authority . . .." (Emphasis added.) 401 U.S. at 416, 91 S.Ct. at 823. Since we need only "consider" whether the Secretary correctly construed his authority, defendants argue, a misconstruction of his authority is not necessarily fatal to the validity of his decision. However, as we read this part of the Court's opinion in its entirety, the Secretary cannot be held to have acted within the scope of his authority if he misconstrued his authority at the time he made the determination, for otherwise we would have been directed to determine only whether, applying the correct standard, the Secretary's determination is supportable by the record. This is not only implicitly,

if not explicitly, clear from the Court's opinion, but it is also implicit in the statutory scheme that the Secretary, exercising expertise, make the determination whether there is a "feasible and prudent" alternative. If this reviewing court refused to remand, even though the Secretary had applied an incorrect standard, simply because, on the record, he could have, applying the correct standard, within reason approved the park route, we would thereby substitute our judgment for his in applying the statute. We would agree that if the record that was before the Secretary were such that, even applying the correct standard, he could not within reason have determined that there was a "feasible and prudent" alternative, it might well be that the application of an incorrect standard would be harmless error, but this is not the case here. On the contrary, for reasons stated, we are of the opinion that on the record the Secretary could properly have determined either that there was or that there was not a feasible and prudent alternative.[7]

At the plenary hearing, plaintiffs took the position that the alternative routes immediately north and immediately south of Overton Park were not only not "feasible and prudent" alternatives but that, on the contrary, they were put forward by the Highway Department of the State of Tennessee to undermine opposition to the route through the park. Thus plaintiffs contended that the disruption and cost involved in those two routes was so great that they were not suggested for consideration in good faith and constituted a fraud.[8]

The "feasible and prudent" alternative route, and the only one, supported by plaintiffs at the plenary hearing is a

7. Although we herein decide that a remand to the Secretary for a route determination is necessary, we discuss and make findings as to the record with respect to the route selection not only to indicate why we think the Secretary's misconstruction of his authority was not harmless error, but also because we might, on appeal, be held to be in error in determining that the Secretary did not consider alternatives and did not apply a correct legal standard.

8. This was not the position of plaintiffs when initially before this court and apparently not their position before the Supreme Court as indicated by that Court's opinion. Then these routes were supported as "feasible and prudent" alternatives. 401 U.S. at 408, 91 S.Ct. 814.

route leaving the park route some distance east of the park, follows the relatively open area alongside Cypress Creek northwestwardly, then follows the Louisville and Nashville Railroad southwestwardly and ultimately connects with the present route at the midtown interchange. (This will be referred to as the "L & N route.") There are variations in plaintiffs' proposed route: one would follow the creek all the way to the railroad, while others would leave the creek at different points before reaching the railroad; one would follow the railroad almost to North Parkway, while others would leave the railroad at various points before it reaches North Parkway. All of these routes would involve a loop a substantial distance to the north of the present east-west alignment. As will be seen, this general possibility was considered by those planning the interstate for the City of Memphis in the 1950's and was rejected; this work was part of the administrative record. It was apparent to us at the conclusion of the plenary hearing, which we then so stated in court, that plaintiffs had fallen far short of showing the L & N route to be so clearly a "feasible and prudent" alternative as to undercut the good faith of the administrative investigation.

The administrative record reflects that by 1955, as a result of studies by the firm of Harland Bartholomew and Associates, which had done the planning for Memphis for many years, a general plan was evolved which included a circumferential expressway and two east-west expressways, one of the latter of which was the park route and the other of which would generally parallel the park route to the south. These two east-west expressways were so located, according to the planners, to give the maximum service and to meet the long-term needs of the City, and thereafter other street planning was done and carried out on the assumption that these expressways would be constructed in such east-west locations. This work is part of the administrative record. About 1958,

the possibility of altering the park route to make use of the L & N right-of-way was considered. Apparently, it was thought that, due to a merger of the L & N and its subsidiary railroad, the N C & St. L, the L & N right-of-way would no longer be used and could be purchased. In any event, at the request of the City, Harland Bartholomew & Associates studied this possibility, including the use of the open area alongside Cypress Creek, and rejected it, primarily, it appears, because the expressway along that route would not be properly located to give the desired service, would add mileage to the thousands using the expressway forever, and would not fit the plan for the development of the other expressways and streets in the City. As stated, this is also in the administrative record.

As heretofore indicated, it is our view that, as of November, 1969, when Secretary Volpe made his determination, the administrative record was such that, based thereon, he could have reasonably believed that the use of any route except the park route was not consistent with "sound engineering" and that it would involve "truly unusual factors." We also find that he could have reasonably believed the contrary. It is further our view that the Secretary, based upon the relevant factors and weighing them as required, could have, without being arbitrary or capricious, determined that the use of any route except the park route was not consistent with "sound engineering" and that it would involve "truly unusual factors" and that, in so deciding, would not be guilty of a clear error of judgment. We also find that he could have determined and decided to the contrary, without his decisions being arbitrary or capricious and without committing a clear error of judgment.

In stating our bases for the foregoing findings, it is rather difficult to distinguish because those facts that appear from the administrative record and those facts that were added to the record at

the plenary hearing.[9] We intend to confine ourselves to the administrative record, which is the record that was before the Secretary in November, 1969. In the first place, the record showed that the L & N route had been studied and rejected for the reasons heretofore indicated. However, the difference in service by the contemplated park route and the L & N route was not shown to be dramatic and the actual difference in miles driven by an individual using the two routes is not great. In the second place, use of the L & N route involves the disadvantage of crossing two main arteries (Summer-North Parkway and Jackson) twice which would make for poorly placed and arranged interchanges. But, as indicated by expert opinion at the hearing, such disadvantages could have been determined to be not great. In the third place, it involves the disadvantage of cutting across the general street grid (east-west and north-south) of the City. But, again, as indicated by expert opinion at the hearing, such disadvantage could have been determined to be not substantial. Fourthly, it would disrupt the drainage into Cypress Creek, but, again, expert opinion at the hearing indicated that this problem could be solved. Fifthly, it would create an engineering-geometric problem in tying in with the existing midtown interchange, which all agree it must do, and in doing so, would require the removal of a substantial part of a commercial area near the interchange, but at the hearing it was shown that, by having the expressway route leave the railroad well east of the midtown interchange and cutting across a residential area, those problems could be obviated. Sixthly, it would require the removal and replacing of some of the City's water pumping facilities, but expert proof showed that this could be done in a reasonable time.

Now the plenary hearing developed additional facts which would even more clearly make a decision against the L & N route within reason and not arbitrary or capricious. It appears that the L & N railroad has not changed its operations and is still making substantial use of this right-of-way both in switching cars in its nearby freight yard and in serving industries. Assuming this line of railroad could be condemned by the United States, as contended by plaintiffs, for this purpose,[10] other arrangements would have to be made for the L & N servicing of industries. If the right-of-way is not completely condemned, the expressway would have to be built on both sides or one side of the railroad, which would create problems for the railroad and the industries served. The expressway would divide an integrated neighborhood in which the neighbors are now making a great effort to stabilize as such. There are some open areas, used by the neighborhood as playgrounds, around the City-owned water pumping stations along the right-of-way that would be obliterated or at least adversely affected.[11]

The remand decision of the Supreme Court also requires that we review the

---

9. On the remand, we can see no reason why the Secretary, if he chooses, could not rely on the entire record made at the plenary hearing, which includes the administrative record, in making his determination.

10. Since this is a "line of railroad," the L & N could not abandon all or any portion of it or extend it or construct a new line without Interstate Commerce Commission approval. 49 U.S.C.A. § 1 (18).

11. While under the remand opinion of the Supreme Court it would seem that the only issue with respect to route was whether the Secretary's selection of the park route, rather than alternative routes, could be approved, it would appear that, in view of the recent holding in D. C. Federation of Civic Associations v. Volpe (D.C.Cir. dec. Oct. 12, 1971), on remand the Secretary should consider the alternative of not building this expressway at all. We say this because if the Secretary should again select the park route and did not consider such alternative and determine it to be not "feasible and prudent," his determination in favor of the park route might well be subject to attack on that ground.

Secretary's design approval under § 4(f) in the same manner as we have reviewed the route approval. This provision also requires that the Secretary not release funds for the expressway unless "such program includes all possible planning to minimize harm to such park. . . ." The Supreme Court's opinion does not construe these words, but counsel for plaintiffs have conceded, we think correctly, that they should be read to mean "all reasonably possible planning," with which defendants agree, so we accept this construction for present purposes. Moreover, plaintiffs have, in their post trial briefs, abandoned their contention that a bored tunnel would be reasonably possible; the evidence at the trial indicated that, in addition to other problems, such a tunnel would cost approximately 150 million dollars. Plaintiffs have, however, added the contention that a route across the park just south of the North Parkway would be preferable to the present one.

■ We believe that the record shows that Secretary Volpe did consider all design alternatives and that in doing so he applied the correct standard, that is, that all that it is reasonably possible to do must be done to minimize harm to the park. We further conclude that, based on the administrative record, hereinafter summarized, the Secretary could have reasonably believed that the design he approved constituted all that was reasonably possible to minimize harm to the park and that, basing his decision on the relevant factors and weighing them in the light of the requirement that all reasonably possible be done to protect the park, his decision that the design met this test was not arbitrary or capricious or a clear error of judgment. It will therefore not be necessary for the Secretary again to consider the design approval.

The Secretary decided against a cut-and-cover tunnel, which would cost an additional 50 million dollars, decided against depressing the expressway throughout its length across the park, and decided against placing the express-way on the north edge of the park. He decided in favor of depressing the expressway except at the point it crosses Lick Creek, and he decided in favor of changing the design of but placing part of the East Parkway interchange in the park. From the record it appears that the Secretary did consider and within reason could find the following facts. The trees and other vegetation would not be preserved with such a cut-and-cover tunnel. Both the tunnel and completely depressing the expressway would create substantial drainage problems and flooding danger both on the expressway and in the park. In the case of the tunnel, there would be, in view of its length, great ventilating and lighting problems, the vehicle gases would be discharged in concentrated form into the park, and the effect of such a deep excavation on the surrounding wooded areas is uncertain but possibly quite harmful. The effect of the expressway, as presently designed, on the nearby zoo would not be substantial, this being supported by a study by experts. To remove the East Parkway interchange completely from the park would cause severe traffic problems on that main artery and would cause the interchange to be too close to North Parkway. The only advantage in placing the expressway on the north edge of the park is that, so placed, it would not divide the park and would allow the zoo to expand to the south. However, there would be great disadvantages: it would not make use of the present bus route through the park, would require removal of some of the existing zoo buildings, and would place the expressway contiguous to a main traffic artery (North Parkway), which would create interchange problems. Moreover, so placing the expressway would not decrease the noise or air pollution problem, if any, for the zoo, and the zoo has ample room to expand with the expressway built in its contemplated location.

Plaintiffs' proof at the hearing concerning the design supported their proffered alternatives, but did not, as we

have already indicated, show that the Secretary's approval of the present design was not supportable by the record.

In May and June, 1971, plaintiffs sought to amend their complaint to add the claim that Secretary Volpe had failed to comply with the National Environmental Policy Act, 42 U.S.C.A. § 4321 et seq. (NEPA), and that such was necessary before he could effectively approve construction contracts let after the effective date of that Act. Upon objection by defendants, we denied such motion to amend on the ground that NEPA is not applicable here because of undisputed reliance on the approval of the park route prior to Secretary Volpe's approval in November, 1969 and because of reliance on his approval prior to the effective date of NEPA. Named Individual Members etc. v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971).

A few days before the plenary hearing plaintiffs, without objection, by amendment to the complaint added some additional contentions. The defendants attack the standing of plaintiffs to make these claims, but we assume here that they do have standing in legal contemplation.

■ One of these contentions is that the Secretary failed to comply with the provision contained in 23 U.S.C.A. § 134.[12] The contention is, stated more specifically, that it does not appear that the involved project is based on "a continuing comprehensive transportation planning process . . . ." On the contrary, the record was replete with

documents and other evidence that the involved expressway was part of the planning carried on by Harland Bartholomew and Associates and others through the 1950's and 1960's and it appears that such planning and the basis thereof were made known to the Secretary and his aides in the Department.

Another contention is that the Secretary has failed to comply with the provision contained in 23 U.S.C.A. § 109 (a).[13] More particularly it is contended that, in line with the holding in D. C. Federation of Civic Associations v. Volpe (D.C.Cir. dec. Oct. 12, 1971), the Secretary should have had available to him studies with respect to the pollution caused by the expressway and its effect on the park in order to comply with that provision. We are inclined to agree with the dissent in the foregoing case because we do not believe that Congress intended that pollution studies are required generally for compliance with § 109(a). In this case, moreover, it was shown that a vehicle moving on an expressway causes less pollution than it otherwise would, and there is no contention that placing the expressway elsewhere and next to residences would reduce the harm, if any, caused by the pollution. In any event, the administrative record shows that a noise, air and vibration pollution study was made in connection with their possible effect on nearby St. Jude Hospital and the study showed that their effect would be negligible. We think that such study satisfies any requirement that could be read into § 109(a), especially in the absence of any showing of a need

---

12. § 134 provides in relevant part: "After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section."

13. § 109(a) provides as follows: "(a) The Secretary shall not approve plans

and specifications for proposed projects on any Federal-aid system if they fail to provide for a facility (1) that will adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance; (2) that will be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality."

for a more particularized study. Further, at the plenary hearing defendants offered testimony of a zoo design expert and introduced into evidence the results of a similar and more recent pollution study vis-a-vis the park, including the zoo, which was not a part of the administrative record, and these showed the effect on the park and zoo would be negligible.[14] It might be, however, that, since this case must be remanded to the Secretary for a route determination, he would be wise to consider the result of this study as reflected in the trial record.

Lastly, plaintiffs contend that the Secretary has not complied with the provision contained in § 109(b).[15] Specifically, plaintiffs contend that the design of the expressway through the park as approved by the Secretary is not adequate to accommodate anticipated traffic twenty years hence and that, indeed, no such projections have been made. We find, however, that the administrative record shows that projections of anticipated traffic for more than twenty years in the future have been made. We further so find that, considering that such projections are admittedly not and cannot be entirely accurate and that the projection with respect to this expressway was made on the assumption that it would be a part of the entire system that has been planned, the approved design for this expressway meets this standard. It is further specifically contended that the right-of-way width through the park is not sufficient to permit compliance with the standards for the interstate system. Here the plaintiffs are in the anomalous position of contending that the defendants, in designing the expressway through the park with an eye to giving maximum reasonable protection to the park, have thereby violated § 109(b). The truth is, however, as appears from the record, that the standards or guidelines that have been adopted are quite flexible and, within rather broad limits, allow the design engineers to take local conditions into consideration. Accordingly, contrary to the contention of the plaintiffs, the steepness of the slopes and the reduced median width through the park, both of which narrowed the width of the expressway, are within such flexible standards or guidelines and do not violate § 109(b).

We conclude, then, that this case must be remanded to the Secretary of Transportation, but only for the purpose of making a route determination in compliance with § 4(f) of the Department of Transportation Act of 1966 as that provision has been construed by the Supreme Court. We further conclude that plaintiffs are entitled to injunctive relief if such appears necessary. In this connection, we are advised by counsel that there is presently no restraining or injunctive order in effect but that defendants have been conducting themselves as if there were such an order in effect.

A judgment will be prepared for entry.

14. The director of the zoo testified for plaintiffs that the noise from the expressway would likely dampen the sex life of the bears and that therefore the production of cubs would be reduced. We find, however, that the noise from the expressway would not add substantially to the noise already emanating from the nearby thoroughfare and therefore would not have this effect even if noise is a factor in such amours.

15. § 109(b) provides as follows: "The geometric and construction standards to be adopted for the Interstate System shall be those approved by the Secretary in cooperation with the State highway departments. Such standards, as applied to each actual construction project, shall be adequate to enable such project to accommodate the types and volumes of traffic anticipated for such project for the twenty-year period commencing on the date of approval by the Secretary, under section 106 of this title, of the plans, specifications, and estimates for actual construction of such project. Such standards shall in all cases provide for at least four lanes of traffic. The right-of-way width of the Interstate System shall be adequate to permit construction of projects on the Interstate System to such standards. The Secretary shall apply such standards uniformly throughout all the States."