TOWNSHIP OF SOUTH BRUNSWICK, A MUNICIPAL CORPORATION, PLAINTIFF-APPELLANT, v. NEW JERSEY TURNPIKE AUTHORITY, A PUBLIC BODY, CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

TOWNSHIP OF MONROE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. WILLIAM T. CAHILL, GOVERNOR OF STATE OF NEW JERSEY, RICHARD J. SULLIVAN, COMMISSIONER OF ENVIRONMENTAL PROTECTION AND THE NEW JERSEY TURNPIKE AUTHORITY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 23, 1973—Decided June 17, 1974.

128

Before Judges HANDLER, MEANOR and KOLE.

*Mr. Alfred P. Opdyke* argued the cause for appellant Township of South Brunswick (*Messrs. Strong, Strong, Gavarny & Longhi,* attorneys; *Mr. Robert A. Longhi* of counsel).

*Mr. Samuel C. Inglese* argued the cause for appellant Township of Monroe.

*Mr. Bernard M. Reilly* argued the cause for respondents (*Mr. Herbert I. Olarsch,* attorney).

The opinion of the court was delivered by

HANDLER, J. A. D. By *chapter* 28, *Laws of* 1972, *N. J. S. A.* 27:23–23.3 *et seq.,* effective May 25, 1973, the New Jersey Turnpike Authority (Turnpike Authority) became authorized to construct an extension to the New Jersey Turnpike from the area of the New Brunswick Interchange 9 of the Turnpike, in a general southeasterly direction, to a point in the vicinity of Toms River and the Garden State Parkway. The Turnpike Authority was prohibited from initiating the project unless the Governor, upon reviewing an environmental impact statement after consulting with the Commissioner of Environmental Protection, declared that the environmental impact statement "adequately provides for minimization of any adverse environmental impact of such project and that such project is in the best interests of the people of this State." *N. J. S. A.* 27:23–23.4. The statement on the project was to be prepared in accordance with guidelines to be established by the Commissioner of Environmental Protection. *N. J. S. A.* 27:23–23.5.

On August 22, 1972 the Commissioner of Environmental Protection promulgated detailed guidelines governing the preparation of the environmental impact statement for the Turnpike extension project. These guidelines were established in accordance with the Administrative Procedure Act of 1968, *N. J. S. A.* 52:14B–1 *et seq.*, and were incorporated into the New Jersey Administrative Code, *N. J. A. C.* 7:1A–1.1 *et seq.* The guidelines directed generally that the environmental impact statement "provide the information needed to evaluate the effects of a proposed project upon the environment." *N. J. A. C.* 7:1A–1.1(a).

Thereafter the Turnpike Authority engaged several consulting firms to prepare an environmental impact statement. Their initial draft statement dealt with one major route for the extension, referred to as the Red alignment. There were also included several partial alternate routes, but since these alternates were not recommended for the project, no separate study of their impact on the environment was presented.

On October 5, 1972 the Turnpike Authority received authorization from the Commissioner of Environmental Protection to print and circulate the draft statement and to hold public hearings. These hearings were held in Monmouth County on December 12, 1972, in Ocean County on December 13, 1972, and in Middlesex County on December 14, 1972. At these hearings the Red alignment was presented, but in addition two other major routes, designated as the Blue and Green alignments, were also brought before the public. Shortly thereafter, a supplementary environmental impact statement covering the Blue and Green alignments was released. No further public hearings were held concerning the content of this abbreviated supplementary statement.

On January 9, 1973 the Turnpike Authority selected a different route, referred to as the Yellow alignment, for the proposed expressway. No separate or additional environmental impact statement was prepared with respect to the Yellow alignment nor were public hearings held on this proposal. On

April 4, 1973 the Commissioner of Environmental Protection recommended to Governor Cahill that he approve the Expressway Project and the recommended Yellow alignment, subject to 12 conditions. On April 13, 1973 Governor Cahill approved this recommendation with the conditions in accordance with the Commissioner's advice.

The separate appeals taken by the Township of South Brunswick (South Brunswick) and the Township of Monroe (Monroe) focus upon the asserted invalidity and inadequacy of the environmental impact statement. For that reason they are treated in a single opinion. It is argued, although not identically by each appellant, that the environmental impact statements did not comply with administrative environmental guidelines; it is also contended that the statements did not apply to major portions of the approved alignment and were not, therefore, statements on the project; further, it is asserted that the Turnpike Authority did not make information on this final alignment available to interested members of the public and failed to hold a public hearing thereon.

At the outset we consider whether the Turnpike Authority, in compiling the initial draft, supplementary and final environmental impact statements, has complied with the statutory criteria contained in *N. J. S. A.* 27:23–23.4 and 23.5, and the administrative guidelines, *N. J. A. C.* 7:1A–1.1 *et seq.*, promulgated pursuant thereto.

*N. J. S. A.* 27:23–23.4 states:

The authority may not acquire any land, erect any structure, nor alter the landscape for the purpose of carrying out the project * * * unless and until the Governor, upon reviewing the environmental impact statement * * * and upon consulting with the Commissioner of Environmental Protection, shall declare that such statement adequately provides for the minimization of any adverse environmental impact of such project and that such project is in the best interests of the people of this State.

*N. J. S. A.* 27:23–23.5 provides in part:

> The authority shall submit to the Governor an environmental impact statement on the project described in section [3] in accordance with guidelines to be established by the Commissioner of Environmental Protection * * *.

The Commissioner of Environmental Protection issued guidelines for the preparation of the environmental impact statement required for the extension, which were published as *N. J. A. C.* 7:1A–1.1 to 1.4. In addition to the directive that the statement provide information as to effects upon the environment (*N. J. A. C.* 7:1A–1.1(a)), it was required that "[t]he impacted corridor area to be studied in detail shall be of sufficient width to encompass all of the alternatives considered," *N. J. A. C.* 7:1A–1.2(a), and that there be included a description and evaluation of each alternative right-of-way alignment. *N. J. A. C.* 7:1A–1.2(b)(5)(ii).

■ It is clear that the Legislature has enacted a statute "setting forth in broad design its intended aims, leaving the detailed implementation of the policy thus expressed to an administrative agency." *Cammarata v. Essex County Park Comm'n,* 26 *N. J.* 404, 410 (1958). Thus, in construing these administrative guidelines the object must be to fulfill the essential purposes of the legislative enactment.

The legislative goals can be extracted in large measure from the National Environmental Policy Act of 1969 ('NEPA), 42 *U. S. C.* § 4321 *et seq.* The state statute is virtually identical with the national act, and the administrative guidelines were patterned closely after the federal model. See, *e. g., Environmental Def. Fund, Inc. v. Coastside Cty. W. Dist.,* 27 *Cal. App.* 3d 695, 701; 104 *Cal. Rptr.* 197, 200 (D. Ct. App. 1972). It has been observed from the legislative history of NEPA that the federal counterpart of *N. J. A. C.* 7:1A–1.2 is a mandatory "action-forcing" requirement, and the criteria contained therein should not be applied mechanically merely to satisfy the statute or be construed so narrowly as to blunt their import and effect. *Calvert Cliffs'*

*Coord. Com. v. United States A. E. Com'n,* 146 U. S. App. D. C. 33, 449 *F.* 2d 1109, 1112–1113 (1971). These procedural strictures are not "inherently flexible," but rather demand "a particular sort of careful and informed decision-making process and creates judicially enforceable duties." *Id.* at 1115.

While perfection is not required (*Cape Henry Bird Club v. Laird,* 359 *F.* Supp. 404, 411–412 (W. D. Va.), aff'd 484 *F.* 2d 453 (4 Cir. 1973)), "nothing less than a complete impact statement" can fulfill the mandate of the operative law. *Environmental Defense Fund, Inc. v. Froehlke,* 473 *F.* 2d 346, 350 (8 Cir. 1972). There must be consideration of all enumerated environmental factors. *Zabel v. Tabb,* 430 *F.* 2d 199, 211 (5 Cir. 1970), *cert.* den. 401 *U. S.* 910, 91 S. Ct. 873, 27 L. Ed. 2d 808 (1971). The statement must contain a "thorough and rigorous analysis of environmental risks." *Brooks v. Volpe,* 350 *F. Supp.* 269, 276 (W. D. Wash. 1972), aff'd 487 *F.* 2d 1344 (9 Cir. 1973). It must not only "catalog environmental facts," but it should also explain fully the underlying reasoning and conclusions in order for the courts and the public to assess and critically evaluate the agency's decision. *Environmental Defense Fund, Inc. v. Froehlke, supra* 473 F. 2d at 351; *Ely v. Velde,* 451 *F.* 2d 1130, 1139 (4 Cir. 1971).

With regard to alternatives, a primary purpose of the statement is to insure that all pertinent information is collated for the officials who must evaluate the impact of different solutions in order to determine which will inflict the least detriment upon the environment. *Natural Resources Defense Council, Inc. v. Morton,* 148 U. S. App. D. C. 5, 458 *F.* 2d 827, 834 (1972). Thus, a full and complete study is an integral part of the decision-making process. *Environmental Defense Fund, Inc. v. Corps of Eng., U. S. Army,* 470 *F.* 2d 289, 295 (8 Cir.), aff'g 342 *F. Supp.* 1211 (E. D. Ark.), applications for injunctions den. 409 *U. S.* 1072, 93 S. Ct. 675, 34 L. Ed. 2d 661 (1972), *cert.* den. 412 *U. S.*

931, 93 S. Ct. 2749, 37 L. Ed. 2d 160 (1973). It follows that an environmental impact statement should include a careful and thorough treatment of each viable alternative to the project. *Monroe County Conservation Council, Inc. v. Volpe*, 472 F. 2d 693, 697–698 (2 Cir. 1972).

Ranged against the command that an environmental impact statement encompass an analysis of all alternative alignments, the Commissioner's conclusion, which was adopted by the Governor, that "the recommended route is within the study corridor" was in error. Since this route was the one selected, by definition, it constitutes an alternative alignment required to have been considered in such a study. *N. J. A. C.* 7:1A–1.2(a); *N. J. A. C.* 7:1A–1.2(b)(5)(ii). The Yellow alignment, we note, does coincide to a great extent with the southeastern segment of the alignment originally included in the draft statement. Nevertheless, critical examination reveals that substantial sections of the Yellow alignment are not within the bounds of the so-called impacted corridor area which was the subject of detailed study. To this extent, this is a flaw which, in our opinion, invalidates the final executive action taken in approving this route for the Turnpike extension project.

Actually, it is something of a misnomer to speak of a single study corridor. As mentioned, the original alignment considered was the Red alignment, together with several variations in certain areas. As to this route, there were several study corridors or areas, the width of which varied with the particular environmental factor under consideration. For example, noise studies were conducted on residences and accustically sensitive nonresidential buildings within 2,000 feet of either side of the Red alignment. Socio-economic factors were studied within one mile of either side of the alignment. Additionally, since it was felt that major socio-economic impacts would be concentrated near interchanges, a study area within a three-mile radius of each interchange was prescribed. A corridor 2,000 feet to either side of the Red

alignment was selected for study of air quality, water resources, soils, vegetation, wildlife and other natural resources. Open space, recreation and related land uses were also studied within 2,000 feet of the Red alignment, and effects upon community institutions were examined within 1,000 feet of either side of the proposed alignment.

The Yellow alignment appears to be in excess of 3,600 feet from the Red alignment, as measured from the points where they both intersect the Turnpike. In addition, the closest the Red alignment comes to the Yellow alignment in the area of the western terminus of the route is approximately 2,700 feet. Thus, in the vicinity of the Turnpike, the Yellow alignment lies entirely outside the impact corridor studied for the effects of noise and impacts upon water resources, air quality, soils, vegetation, wildlife, natural resources, open spaces and community institutions.

Other portions of the Yellow alignment (generally from mileposts D21 to D23 and D28 to D32 on the illustrative maps) also fall entirely without the impact corridors utilized for the Red alignment, or are so near the outer perimeters of these corridors as to render those studies inadequate when related to the route selected. It must be further noted that numerous environmental factors were not separately examined in the supplementary impact statement prepared for the Green and Blue alignments, and no corridor referable to these alignments is identified for many of the factors that were included in the original study. Consequently, the defects attending the Red alignment study corridors, as applied to the Yellow alignment, have not been compensated for by the supplementary impact statement involving the Green and Blue alternatives. *Cf. Environmental Defense Fund, Inc. v. Froehlke, supra.*

We conclude, therefore, that the environmental impact statement did not include in its preparation a study of impacted corridors of sufficient width to encompass the alternative that was ultimately selected. As a consequence, the

statement did not in this respect include all alternative right-of-way alignments, which was contrary to *N. J. A. C.* 7:1A–1.2(a) and for that reason it was not prepared in accordance with applicable administrative guidelines as required under *N. J. S. A.* 27:23–23.5.

The failure to prepare an adequate environmental impact statement applicable to the Yellow alignment cannot be excused, as urged by respondent, on the ground that the ultimate determination to approve that alignment was not arbitrary or capricious. It is suggested, in effect, that there was substantial compliance with statutory and administrative directives because the studies actually undertaken were quite thorough and can be related reasonably to the Yellow alignment without undue extrapolation.

The guidelines specify that the environmental impact statement shall include certain factors. These are a description of the project, including technical data and information sufficient to enable the environmental impact to be carefully assessed; the probable impact of the project on ecological systems, including primary and secondary impacts; any probable and unavoidable adverse environmental effects; an evaluation of the procedures which will minimize these adverse effects; a comparative evaluation of long-term and short-term environmental effects, and a quantitative identification of any irreversible and irretrievable commitments of resources necessary to implement the program. *N. J. A. C.* 7:1A–1.2.

Judicial review of administrative action in this area must be responsive to these criteria. The court should consider, therefore, whether the agency has conscientiously balanced competing considerations. *Calvert Cliffs' Coord. Com. v. United States A. E. Com'n, supra* 449 F. 2d at 1113–1114 (n. 9) and 1115. It must also determine whether the administrative evaluation sufficiently accounts for environmental factors. *Environmental Defense Fund, Inc. v. Corps of Eng. U. S. Army, supra* 470 F. 2d at 300; *cf. Cili-*

*zens To Preserve Overton Park v. Volpe,* 401 *U. S.* 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971) ; *Zabel v. Tabb, supra,* 430 F. 2d at 211. The court, in exercising its function of judicial review, acts as a guardian of the statute to insure that its mandate is fulfilled and that all environmental factors are considered. *Save Our Ten Acres v. Kreger,* 472 F. 2d 463, 467 (5 Cir. 1973). See *Citizens To Preserve Overton Park, Inc. v. Volpe,* 335 *F. Supp.* 873, 876–877 (W. D. Tenn. 1972), remanded 357 *F. Supp.* 846 (W. D. Tenn. 1973). *Cf. N. J. Sports & Exposition Authority v. McCrane,* 61 *N. J.* 1, 62–66 (Hall, J., concurring and dissenting in part), *cert. den.* 409 *U. S.* 943, 93 S. Ct. 271, 34 L. Ed. 2d 215 (1972), aff'd 62 *N. J.* 248 (1973) ; *Texas East. Trans. Corp. v. Wildlife Preserves, Inc.,* 48 *N. J.* 261, 272 (1966), aff'd 49 *N. J.* 403 (1967).

Because the noninclusion in the final environmental impact statement of the Yellow route as one of the alternative alignments is a fatal defect, the administrative and executive action in approving that route for the extension project must be declared invalid. We need not, therefore, resolve the related question as to whether that action was arbitrary or capricious because of a failure to examine in depth many of the factors required to be considered by the administrative regulations. For example, in the original draft statement which focused upon the Red alignment, some of the minor alternative routes mentioned therein fell outside the one-mile socio-economic study and others were beyond the areas examined for noise, air and water quality, soils and vegetation effects. While a three-mile radius was utilized to study the socio-economic impact at major interchanges, the area to the northwest of the Turnpike at the proposed interchange of the Turnpike with the Red alignment apparently was not studied. With respect to the supplemental statement applicable to the Blue and Green alignments no study corridors were delineated therein and in particular no corridor was identified with respect to air quality, vegetation, water re-

sources, open space and recreation factors. Wildlife, soils and community institutions were not studied at all. The effect of the proposed Red, Blue and Green alignments on water resources seems not to have been based on any careful analysis. Similarly, the relative impact of these routes on surface water was not evaluated on the basis of the data collected and no full studies were undertaken with respect to wildlife because of "time constraints and the time of year."

Thus, it would appear that the environmental impact statements in some respects may not have complied with the legislative and administrative mandate that all pertinent factors impinging upon the environment in its very broadest sense be explored thoroughly. These apparent substantive inadequacies are magnified by the attempt to apply the statements to the path which was finally proposed since, to reiterate, in material areas it did not coincide with the alignments actually studied. These observations would serve only to strengthen the conclusion, which we have reached, that the environmental impact statements were invalid because they did not include the Yellow alignment.

It is also contended that the action taken in selecting the final path for the Turnpike extension is invalid because no public hearings were conducted under *N. J. A. C.* 7:1A–1.3 with regard to the Yellow alignment. Public hearings were conducted in Middlesex County on December 14, 1972 to determine the feasibility of the Red, Blue and Green alignments (although the supplementary statement applicable to the latter two routes was not available until after the hearing). It is now asserted that the public was not given the opportunity to express its views with respect to the impact of the road upon an area referred to as the Pidgeon Swamp. It is true that none of the South Brunswick or other municipal or county officials voiced any concern for the Pidgeon Swamp at the time of the public hearing. This is understandable since the draft impact statement which had been disseminated before the hearing rejected the Red alignment

alternates because of their threatened intrusion upon this swamp area. There was also qualified opposition expressed by representatives of South Brunswick with respect to the northern terminus of the project at the existing Turnpike. It should be pointed out, however, that this juncture was the same for all three alternative alignments — the Red, Blue and Green — but it was quite different from the terminus which was included in the final proposal for the Yellow alignment. With respect to its course through Middlesex County, the Yellow route, in significant respects, did conform to an alignment suggested by the Monroe Township Planning Board and recommended by the mayor of Monroe Township. It may be noted, however, that at the public hearing there was some opposition expressed with respect to the mayor's proposal, and a public hearing on this was sought.

■ The failure to conduct a public hearing on the route ultimately selected was in direct contravention of *N. J. S. A.* 27:23–23.5, *N. J. A. C.* 7:1A–1.2(2) and *N. J. A. C.* 7:1A–1.3, which require that the public be informed by an impact statement prior to hearings so that they may adequately comment upon the proposed alternate alignments within a defined corridor. It is to be emphasized that the draft of the environmental impact statement must be certified as to its completeness by the Commissioner. *N. J. A. C.* 7:1A–1.3(b). It is *this* draft which is then required to be disseminated and which becomes the subject of the public hearings. *N. J. A. C.* 7:1A–1.3(b), (c) and (d). The guidelines require explicitly that the draft statement shall not only be based upon a detailed study of an impacted corridor area which "encompasses *all* of the alternatives considered," *N. J. A. C.* 7:1A–1.2(a) (emphasis supplied); there must also be treated alternatives to the proposed project including a "[d]escription of alternative right-of-way alignments with an objective evaluation of the alternatives * * *." *N. J. A. C.* 7:1A–1.2(b)(5)(ii).

■ Since the Authority chose to recommend a route which was not in substantial areas included in its draft and supplementary statements as an alternative right-of-way alignment, the public hearings which were held thereon did not satisfy this requirement. *N. J. A. C.* 7:1A–1.3(d) and (e). If a proposed alignment constitutes, as here, a marked shift from significant portions of the routes initially considered and it does not fall within the impacted study corridor, a new statement should have been prepared in accordance with *N. J. A. C.* 7:1A–1.2(a) and additional hearings undertaken. *Cf. Save Our Ten Acres v. Kreger, supra; Citizens To Preserve Overton Park, Inc. v. Volpe, supra* at 335 *F. Supp.* 873. Under those circumstances, a public hearing based upon an additional environmental impact statement would furnish the opportunity for the presentation of views by persons who might be affected by or otherwise concerned about the new proposal. *D. C. Federation of Civic Associations, Inc. v. Volpe,* 316 *F. Supp.* 754, 779 (D. D. C. 1970), rev'd and remanded 148 U. S. App. D. C. 207, 459 *F. 2d* 1231 (1971), *cert.* den. 405 *U. S.* 1030, 92 S. Ct. 1290, 31 L. Ed. 2d 489 (1972). By recommending a different alignment after a public hearing addressed to other routes, the Turnpike effectively shielded from public exposure areas of legitimate and reasonable concern, including the possible spoliation of the Pidgeon Swamp. *Daly v. Volpe,* 350 *F. Supp.* 252, 260 (W. D. Wash. 1972). We conclude that this failure to prepare a supplementary environmental impact statement and to conduct hearings thereon constitutes an added reason for the invalidation of final approval of the proposed extension route.

■ We are also of the view that the approval of the final environmental impact statement by the Commissioner and Governor cannot be regarded as conclusive of the proposition that the Authority has complied with the letter and intent of the governing statute and guidelines. This contention, made by the Authority, is a rejoinder to an argument made by South Brunswick that the determinations of the Com-

missioner and Governor are not immune from judicial review. We agree with appellant's position. *Cf. Committee For Nuclear Responsibility, Inc. v. Seaborg,* 149 U. S. App. D. C. 380, 463 *F.* 2d 783, 787, injunction den. 404 *U. S.* 917, 92 S. Ct. 242, 30 L. Ed. 2d 191 (1971). Moreover, the failings in the environmental impact statement, which we have adumbrated, are not extenuated or overcome by the imposition, at the executive level, of *ad hoc* conditions designed to eliminate or mitigate these deficiencies.

█ The Turnpike Authority has also contended that South Brunswick cannot maintain its appeal since it failed to join the Governor as an indispensable party. Although the appeals were ostensibly taken from the recommendation of the Turnpike Authority, it is the Governor's approval of the Yellow alignment, based on the Commissioner's recommendation, which is the actual basis for the appeal, and the relief sought, if granted, necessarily would impugn that determination. The Governor and the Commissioner of Environmental Protection, however, were joined as defendants in the companion appeal by Monroe Township. Since the issues are identical in each appeal and a judgment in the Monroe Township appeal would bind the Governor, the issue concerning failure of joinder need not be further treated. It would, at this juncture, be pointless to dismiss the South Brunswick appeal because of the nonjoinder of the Governor since the issues in that appeal have been treated fully on the merits and the Governor, as well as the Commissioner, had the opportunity to participate in the companion appeal and are fully bound by its disposition. It is appropriate, however, that the Governor and the Commissioner be joined formally as parties, which we now direct on the court's motion.

For the foregoing reasons the actions of the Governor in approving the recommendation of the Commissioner of the Department of Environmental Protection are declared invalid and set aside. Appellants shall be entitled to renew their applications for injunctive relief.