ENVIRONMENTAL DEFENSE FUND et al.,

v.

TENNESSEE VALLEY AUTHORITY, Aubrey J. Wagner, Chairman, Tennessee Valley Authority.

Civ. A. No. 7720.

United States District Court, E. D. Tennessee, N. D.

Jan. 11, 1972.

---

18. 153 So.2d at 688.

Jon T. Brown, Wallace L. Duncan, Washington, D. C., Lawrence R. Reno, Reno & Judd, Denver, Colo., Edward Lee Rogers, East Setauket, N. Y., Julian D. Butler, Butler & Potter, Huntsville, Ala., for plaintiffs.

Robert H. Marquis, Beauchamp E. Brogan, Justin M. Schwamm, Tennessee Valley Authority, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Plaintiffs, Environmental Defense Fund, Trout Unlimited, Association for the Preservation of the Little T and Thomas Burel Moser, seek a preliminary injunction prohibiting defendants and all their agents and servants and all persons in active concert and participation with them from further construction work on the Tellico Project of the Little Tennessee River, including construction of dams and other earth works, construction of the causeway to Ft. Loudon, relocation of Citico Road and all other construction and activities which will alter the natural environment of the project area. Evidence was received in support of and in opposition on January 7 and 10, 1972. At the conclusion of the evidence and argument of counsel, the Court advised counsel of its views but would withhold final decision until a later date.

It is considered appropriate to make a detailed statement of the background of the litigation, including specific findings of fact and conclusions of law.

### Findings of Fact

Defendants are a wholly-owned corporation of the United States and the Chairman of its Board of Directors. 16 U.S.C. § 831 et seq. Tennessee Valley Authority (TVA) is engaged in construction of the Tellico Dam and Reservoir Project on the Little Tennessee River in Blount, Loudon and Monroe Counties, Tennessee. The project is an integrated plan for the economic development of that three-county area.

Plaintiffs are three non-profit organizations and an individual landowner of

Monroe County, who are attempting to preserve the lower thirty-three miles, free-flowing stretch of the Little Tennessee River as it exists in its present, natural state. This stretch is acknowledged to be the largest and best trout fishing water east of the Mississippi River. On the south bank of the Little Tennessee is Fort Loudon, built in 1756, as England's southwestern outpost in the French and Indian War. The river bottomlands also contain several village sites of the Cherokee Indian Nation that have considerable archeological significance. They include Chota, the ancient capital of the Cherokees, Tuskeegee, the birthplace of Sequoyah, and Tenassee, from which Tennessee derives its name. These archeological stores are virtually untapped. The free-flowing river is the likely habitat of one or more of seven rare or endangered fish species. The winding, free-flowing lower Little Tennessee River lies in a picturesque, pastoral setting untouched by urban and industrial blight and pollution. The evidence shows that all of these benefits of the present Little Tennessee River Valley will be destroyed by impoundment of the river, which is scheduled for 1975, as will some of the most valuable and productive farm land in East Tennessee.

The fulcrum of the project is a concrete and earthfill dam near the mouth of the Little Tennessee River; a navigable canal connecting the proposed Tellico Reservoir with Ft. Loudon Reservoir on the main Tennessee River; and a nine-foot navigable channel extending thirty miles upriver to a point three miles downriver from the existing Chilhowee Dam (owned by the Aluminum Company of America). The project plan provides for TVA's acquisition of 38,000 acres, of which 16,500 acres of river bottomland will be inundated by the reservoir. (This includes 2100 acres in the present stream bed.) The remaining 21,500 acres will be devoted to industrial, commercial, residential and recreational developments. The project plan includes the creation of a new community of 50,000 people designed to demonstrate the latest concepts of a high quality urban environment.

Congress appropriated the first funds for construction of this project on October 15, 1966; and, the TVA Board authorized construction on November 8, 1966. Construction of the concrete portion of the dam commenced on March 7, 1967, and was completed on February 28, 1969. Construction of a four-lane steel span bridge with concrete decking to carry State Highway 411 over the proposed reservoir was begun approximately a year ago and has been completed. Approximately two-thirds of the land tracts for the overall project has been acquired. Twenty-nine million dollars of the estimated $69,000,000.00 cost of the project has been expended. In November, 1971, TVA began cutting a trench at the proposed location for the earthfill portion of the dam. The purpose of the trench is to reach the rock strata some thirty feet below ground level in order to seal the rock to prevent leakage from the reservoir. This work is continuing.

On June 27, 1969, TVA contracted with Monore County, Tennessee, to relocate some thirty miles of county roads that will be flooded by the reservoir. Execution of this project is proceeding and some five to eight miles have been completed. TVA is presently cutting and burning timber, removing ground cover and moving earth in constructing the Monroe County Road. The stretch of the proposed road now under construction consists of denuded land that will erode quickly unless promptly stabilized. In the wet winter season, seeding and strawing bare soil has a low success probability as a stabilization method. Consequently, the most effective stabilization method at this time of year is completion of the road on the denuded land.

On June 18, 1971, TVA filed with the Council on Environmental Quality a "draft" environmental impact statement concerning the Tellico project. Preparation of a final, detailed statement is under way and completion expected by

February 1, 1972. Although comprehensive in scope, the draft statement's cost-benefit analysis consists almost entirely of unsupported conclusions. As a result, a non-expert reader is denied the opportunity to intelligently evaluate TVA's conclusions. In addition, it is impossible to determine the thoroughness of the research upon which TVA based the conclusions, or their relative merit. A lack of careful research and planning is suggested by two statements contained in the statement itself:

"While land use planning is far from complete, *broad conclusions* concerning the environmental impact . . . *can be made at the present time* . . ." (Emphasis added.)

p. 12

and

" . . . TVA will prepare one or more supplemental environmental statements, as appropriate, for Tellico land development when detailed proposals are completed."

p. 13

Since these statements concerned the long-range recreational, residential and industrial development of the area, they show a failure to consider the long-range environmental impact of the project on the area.

Plaintiffs introduced expert testimony showing scenic, recreational, archeological, and fish and wildlife losses threatened by impoundment which are not apparent from a reading of the draft statement. Defendants disputed the significance of these losses.

TVA concluded that the project's cost-benefit ratio would be 1:3.

The East Tennessee Development District is an organization with a staff of professional planners concerned with the economic development of a sixteen county area centered on Knoxville and including the Tellico project area. Its executive committee, in response to the draft statement, concluded that: "The costs and benefits of the Tellico Project and the river in its present state are essentially an equation. . . ." "The

project benefits versus losses are a toss up at this time. . . Much of [the project's] success hangs tenuously on the follow-through of many other agencies and units of government, . . ." Some of their specific criticisms of the project were stated as follows:

" . . . Urbanization and industrial development will be accelerated in an area *not now* equipped to handle it in utilities and other services: other areas as well situated and better equipped for new town development and large scale industrialization *are* available on the main stream of the Tennessee River. There are real hazards in shifts in the earth's structure from the location of the reservoir on known earth faults. Power and flood control benefits are acknowledged as negligible."

TVA's draft statement does not deal with these objections. In particular, there is no mention of the increased danger of earthquakes due to the location of the reservoir.

The East Tennessee Development District's comments are of particular significance because its function is to foster economic growth rather than wilderness preservation.

After several months' study of the draft statement by several agencies of the State of Tennessee and the staff of Governor Winfield Dunn, on December 7, 1971, Governor Dunn wrote Mr. Wagner, Chairman of TVA's Board of Directors, and stated his conclusion "that the interests of the State would be best served if TVA were to discontinue plans to impound the Little Tennessee River." In his judgment the present scenic, recreational, historical and archeological attributes of the project area are "too valuable for the State of Tennessee to sacrifice."

Mr. Wagner's seven page reply to Governor Dunn is almost totally devoted to the economic benefits which TVA anticipates from the project. Thus, it is evident that there is a high level contro-

versy concerning the merits of the project. The issue between the parties appears to be whether the people of Tennessee, and of the United States, consider economic development or preservation of the natural environment to be more important.

It would cost TVA $50,000.00 to halt work on the project then start it back up. There are 121 trades and labor employees working on the project who would have to be laid off in the event an injunction is issued. Wet weather conditions in the winter cause spring, summer and fall to be the best times of the year to work on the project. Employees are sent home when it is too wet to work, and, except for reporting time, they are not paid for the time they do not work. Because this is the wet winter season, an injunction at this time would cause TVA minimum losses in both time and money.

### Conclusions of Law

Plaintiffs' motion for a preliminary injunction is based on defendants' failure to file a detailed environmental impact statement. Section 102(2) (C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 *et seq.* provides in pertinent part:

"The Congress authorizes and directs that, *to the fullest extent possible*: . . . (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on *proposals for legislation* and other major Federal actions significantly affecting the quality of the human environment, a *detailed* statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

\* \* \* \* \* \*

" . . . Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available . . . to the public . . . " (Emphasis added.)

The purpose of a section 102(2) (C) detailed environmental impact statement is (1) to aid the agency's decision-making process and (2) to advise the public of the environmental consequences of the proposed action. The requirement seeks to insure that each agency decision-maker has before him, and takes into proper account, all environmental impacts of a particular project. Only if this is done will the most intelligent, optionally beneficial decision be likely to result. Moreover, the detailed statement provides evidence that these factors have been taken into account. More importantly, it allows those removed from the decision-making process to evaluate and balance the factors on their own. In fact, "if the decision was reached procedurally without individualized consideration and balancing of environmental factors—*conducted fully* and in good faith—it is the responsibility of the courts to reverse." (Emphasis added.) Calvert Cliffs v. A. E. C., 449 F.2d 1109 (D.C.Cir., 1971).

"At the very least, NEPA is an environmental full disclosure law. The Congress, by enacting it, may not have intended to alter the then existing decisionmaking responsibilities or to take away any then existing freedom of decisionmaking, but it certainly intended to make such decisionmaking more responsive and more responsible."

> Environmenal Defense Fund v. Corps of Eng. of U. S. Army, 325 F.Supp. 749, 759 (E.D.Ark., 1971)

NEPA was enacted and became effective on January 1, 1970. TVA contends

that it does not have to comply with section 102(2) (C) with respect to its Tellico project. As previously noted, the Tellico project was approved and the first appropriations of funds made in 1966. Construction began in 1967. Accordingly, the critical question in this case is whether section 102(2) (C) is applicable to the Tellico project.

■ In analyzing the pertinent portions of 102(2) (C), it is noted that the detailed statement is required to be included "in every recommendation or report on proposals for legislation." Since the Tellico project is funded by annual Congressional appropriations, it would appear that a request for such an appropriation would be a "proposal for legislation" within the meaning of section 102(2) (C). Consequently, each appropriation request after January 1, 1970 would be required to be accompanied by a detailed environmental impact statement.

Section 102(2) (C) includes the qualifying phrase "to the fullest extent possible." This phrase suggests that the requirement might not be applicable to ongoing projects on the date of enactment. However, the legislative history of this phrase indicates that the phrase:

"  .   .   . is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section 'to the fullest extent possible' under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance."

Conf.Rep.No.91–765, 91st Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News, pp. 2767, 2770

This phrase has been interpreted as requiring compliance with Section 102 to the fullest extent, "unless there is a clear conflict of *statutory* authority." Calvert Cliffs v. A. E. C., supra, 449 F. 2d at 1115.

In addition, the Council on Environmental Quality issued on April 30, 1970, "Interim Guidelines" for enforcement of NEPA. They provide in part that:

"  .   .   . the section 102(2) (C) procedure should be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to the enactment of [NEPA]."

35 Fed.Reg. 7390, 7392, § 11

The same language was retained in the permanent guidelines promulgated on April 23, 1971. 36 Fed.Reg. 7724, 7727, § 11. Such administrative interpretation cannot be ignored except for the strongest reasons, particularly where the interpretation is a construction of a statute by the men designated by the statute to put it into effect. See United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441 (1956); Environmental Defense Fund v. Corps of Eng. of U. S. Army, 325 F.Supp. 728 (E.D.Ark., 1971).

Furthermore, the omission of the traditional grandfather clause in NEPA as well as the Act's stress on the inclusive applicability of the policy promulgated by the Act indicates a strong legislative intent to apply section 102 to federal action initiated prior to January 1, 1970. See Nolop v. Volpe, 333 F.Supp. 1364 (D.C.D., 1971).

■ For the indicated reasons, it is clear that 102(2) (C) statements are required for ongoing federal actions initiated prior to January 1, 1970, such as the Tellico project.

Despite the clear legislative intent and the interpretation of the Council on Environmental Quality, a few courts have held the Act is not retroactive. Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Pa., 1970), aff'd 454 F.2d 613 (C.A.3, 1971); Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038 (D.Or., 1970); Brooks v. Volpe, 319 F.Supp. 90 (W. D.Wash., 1970). See also Elliot v. Volpe, 328 F.Supp. 831 (D.Mass., 1971). None of these opinions analyze NEPA to determine whether the theory has any

merit beyond noting the absence of language requiring retrospective application. As already shown, NEPA is not retroactively applied to an ongoing project.

A number of cases have enjoined construction on federal projects for failure to comply with section 102(2) (C). The cross-Florida barge canal was one-third complete when NEPA was enacted. The Court said: "The public interest in avoiding, if possible, any irreversible damage to the already endangered environment is paramount." Environmental Defense Fund, Inc. v. Corps of Engineers, 324 F.Supp. 878, 880 (D.C.D.C., 1971). The letting of construction contracts for the Tennessee-Tombigbee Waterway project was enjoined because the environmental impact statement did not fully comply with the requirements of the Act. The project had been approved in 1962. Environmental Defense Fund v. Corps of Engineers, 331 F.Supp. 925 (D.C.D.C., 1971). In Morningside-Lenox Park Ass'n v. Volpe, 334 F.Supp. 132 (N.D.Ga., 1971), the Court held that compliance with Section 102((2) (C)

> ". . . is required as to an ongoing federal project on which substantial actions are yet to be taken, regardless of the date of 'critical' federal approval of the project."

334 F.Supp. at 144

Failure to file a detailed impact statement precipitated an injunction prohibiting construction of the Gilham dam which was one element of a large project authorized in 1958. While no work had been done on the Gilham dam itself, 63% of the overall project had been completed. The Court found inadequate a purported section 102(2) (C) statement filed after the lawsuit was instituted. Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749, 757–762 (E.D.Ark., 1971).

On review of these and other cases brought to its attention, this Court concludes that the weight of reason and authority requires TVA to comply with Section 102(2) (C) of NEPA with regard to its Tellico Dam and Reservoir project despite the fact that that project was initiated prior to January, 1970.

*Summary and Conclusion*

The Court is cognizant of the various factors that are to be weighed in considering a motion for a preliminary injunction, namely, (a) substantial question, (b) probability of success on the merits, (c) balancing of injuries to parties, (d) and the public interest, which is of paramount importance. The future of the Valley of the Little Tennessee River is important to all citizens of the United States.

Accordingly, the motion is granted, except as to work on land already cleared for road construction in Monroe County and except as to the work of the mapmaking and reporting employees who work under Mr. Reed Elliott, which is not threatening the environment.

Plaintiffs will execute and file an injunction bond in the penalty of $100.00 in accordance with Rule 65, Federal Rules of Civil Procedure.