Richard J. BROOKS a citizen, et al.,
Plaintiffs,

v.

John A. VOLPE, as Secretary of the United States Department of Transportation, et al., Defendants.

No. 9144.

United States District Court,
W. D. Washington,
at Seattle.

Aug. 4, 1972.

---

31. The court notes that plaintiff-intervenors call themselves, frankly, "Citizens Against Freeways."

272

———◆———

Irving M. Clark, Jr., J. Richard Aramburu, Seattle, Wash., for plaintiffs.

Stan Pitkin, U. S. Atty., Albert E. Stephan, First Asst. U. S. Atty., Seattle, Wash., for Federal defendants.

Thomas R. Garlington, Asst. Atty. Gen., Olympia, Wash., for State.

## OPINION RE MOTION OF DEFENDANTS FOR ORDER OF COMPLIANCE

BEEKS, Chief Judge.

### I. *Facts and Procedural History*

The highway project under consideration is a segment of I–90, part of the national system of interstate and defense highways stretching from Seattle to Boston, and funded by 90% federal funds.[1] The project contemplates the addition of three lanes to an existing seven-lane highway through Snoqualmie Pass in the Cascade Mountain Range, about 45 miles east of Seattle. The project lies within the Snoqualmie National Forest, and will provide a major transportation route between Seattle, points on the east side of the Cascades, and several major skiing and recreational facilities near Snoqualmie Pass. Trees have already been cleared on a large part of the project, and grading has started; seven major structures are under way, $14 million of construction is under contract, and a substantial percentage of the work has been completed.[2]

The complaint, filed August 18, 1970, alleges that defendants failed to comply with 23 U.S.C. § 138, and 42 U.S.C. §§ 4321 et seq. This court held that, since the highway would not physically traverse any portion of Denny Creek Campground, there would be no "use" of that land within the meaning of 23 U.S.C. § 138, and that 42 U.S.C. §§ 4321 et seq., which became effective January 1, 1970, was inapplicable to the 1967 location ap-

1. 23 U.S.C.A. § 120(c) (1970). The statutory framework is described in Lathan, et al. v. Volpe, et al., 9 Cir., 455 F.2d 1111 (1971), reh. den. 455 F.2d 1122 (1972). See also Comment, Favoring Parks Over Highways—A First Step Toward Resolving the Conflict Between Preservation of Environmental Amenities and Expansion of the Highway System, 57 Iowa L.Rev. 834, 835–37, 848–53 (1972).

2. Exhibit A–1, p. 5; affidavit of H. W. Humphres, filed and dated June 8, 1972.

proval.[3] The court of appeals reversed on both points, and remanded the case for further review.[4] Defendants have moved for an order of compliance, on the basis of two exhibits filed with the court at a hearing held June 12, 1972.[5] The motion is denied.

## II. *The Impact Statement*

The National Environmental Policy Act of 1969 [6] (NEPA) provides, in part:

§ *4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts*

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have a [sic] impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to

3. Brooks, et al. v. Volpe, et al., 319 F. Supp. 90 (W.D.Wash.1970), and 329 F.Supp. 118 (W.D.Wash.1971).

4. Brooks, et al. v. Volpe, et al., 460 F.2d 1193 (9th Cir. 1972).

5. Exhibit A–1, a combination environmental impact statement and "4(f)" statement, and exhibit A–2, relating to federal approval of the environmental impact statement and "4(f)" statement.

6. 42 U.S.C.A. §§ 4321 et seq. (1972 Supp.).

initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter.[7]

■■ There are essentially two functions served by the preparation and distribution of the impact statement described in § 4332(2)(C) *supra*: (1) to provide evidence that the decision-making process required by NEPA was in fact accomplished; and (2) to give the decision-makers who are removed from the initial decision sufficient data from which to make their own decisions.[8] The court's only function is to see that agencies obey the Congressional command to assemble the necessary information, perceive and weigh the alternatives, and articulate in writing the reasons for the choices made.[9]

As originally drafted, NEPA authorized the Secretary of the Interior to conduct research, accumulate and analyze data, keep tabs on federal projects affecting the environment, and act as a clearinghouse of environmental information. There was no action-forcing provision, and no requirement that all agencies conduct research or file impact statements.[10] After extensive hearings, the bill was amended by the committee to require that all agencies include in every recommendation or report on major federal actions "a finding by the responsible official" that he had considered the environmental consequences of the proposal.[11] Federal agencies were to be expressly authorized to allocate funds for "research, studies and surveys related to ecological systems and the quality of the environment." [12]

The House substitute was a substantially watered down version; the Senate adamantly refused to accept the House version without the "action-forcing" features. The Senate appointed a conference committee, which was given the task of retaining the essential features of the Senate version. In so doing, the Senate authorized the conferees to press for a requirement of a "detailed statement" rather than merely a "finding," which would have made it easier for administrators to relegate environmental considerations to one more set of forms for signature.[13]

The bill produced by the conferees adopted in large part the Senate version, including the action-forcing provisions. Compliance was made mandatory "unless the existing law applicable to the agency's operations expressly prohibits [full compliance] or makes full compliance with one of the directives impossible."[14]

. . . The most important provisions of [former] Title II relating to research and data gathering were retained by the Conference Committee in Section 102 of Title I and in Sec-

---

7. 42 U.S.C.A. § 4332 (1972 Supp.).

8. Calvert Cliffs' Coordinating Committee, Inc., et al. v. United States AEC, et al., 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971) ; Environmental Defense Fund, Inc. [E.D.F.], et al. v. TVA, et al., 339 F.Supp. 806 (E.D.Tenn.1972) ; Natural Resources Defense Council, Inc., et al. v. Grant, et al., 341 F.Supp. 356 (E.D.N.C.1972).

9. Scherr, et al. v. Volpe, et al., 336 F.Supp. 886, 890 (W.D.Wis.1971).

10. S.1075, 1969 U.S.Code Cong. & Admin. News, p. 2751, 115 Cong.R. (1st Sess. 1969) 3698, 3701.

11. 115 Cong.R. (1st Sess. 1969) 19008.

12. *Id.* at 19011.

13. 115 Cong.R. (1st Sess. 1969) at 29051–2, 29066, and 29083–4.

14. Conference Report on S.1075, National Environmental Policy Act of 1969 [II. Rept. # 91–765], 115 Cong.R. (1st Sess. 1969) 39703.

tions 204 and 205 of Title II of the Conference Report.[15]

The Council on Environmental Quality (CEQ) was to provide general research of broad scope,[16] while each agency was left to provide the research necessary to indicate the environmental impact of its own proposed projects.[17] While impact statements are to be filed with CEQ for comment,[18] such comment is advisory only. The major task of the CEQ is to keep the President informed of how well federal programs are meeting NEPA requirements.[19]

■ NEPA must be complied with "to the fullest extent possible." [20]

Mere administrative difficulty does not interpose such flexibility into the requirements of NEPA as to undercut the duty of compliance "to the fullest extent possible." But if this requirement is not rubber, neither is it iron. The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—

and time—available to meet the Nation's needs are not infinite.

. . . . . . .

. . . So long as the officials and agencies have taken the "hard look" at environmental consequences mandated by Congress, the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken.[21]

■■ Compliance with NEPA is not established merely by the filing of an impact statement in the form and by the procedure outlined by the statute.[22] In Natural Resources Defense Council, et al. v. Morton, et al.,[23] for example, the Department of the Interior filed a 67-page impact statement in relation to a proposed lease of oil lands off the shore of Louisiana. The trial court issued an injunction, and the Court of Appeals for the District of Columbia Circuit denied a motion for summary reversal. It held that other alternatives, including the use of atomic energy and prorationing of gas, must be discussed, since the

---

15. National Environmental Policy Act of 1969—Conference Report [to the Senate], Exhibit I, 115 Cong.R. (1st Sess. 1969) at 40418.

16. *Id.* at 40421.

17. 42 U.S.C.A. § 4332(2)(A), (B), (D) and (G) (1972 Supp.), quoted in text *supra* note 7.

18. 42 U.S.C.A. § 4332(2)(C) (1972 Supp.).

19. 42 U.S.C.A. § 4344 (1972 Supp.); National Helium Corp. v. Morton, et al., 455 F.2d 650 (10th Cir. 1971).

20. 42 U.S.C.A. § 4332 (1972 Supp.).

21. Natural Resources Defense Council, et al. v. Morton, et al., 458 F.2d 827, 837, 838 (D.C.Cir. 1972) (footnotes omitted). *See also* National Helium Corp. v. Morton, et al., 455 F.2d 650 (10th Cir. 1971); Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. den. 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808; E.D.F., et al. v. Corps of Engineers of United States Army et al., 325 F.Supp. 749 (E.D.Ark.1971) (opinion # 5); and Pennsylvania Environmental Council, et al. v. Bartlett, et al., 315 F.Supp. 238 (M.D.Penn.1970), aff'd. 454 F.2d 613 (3rd Cir. 1971).

22. Department of Transportation Policy and Procedure Memorandum (PPM) 90–1 (1971) now governs impact statements filed in federal aid highway projects. Appendix E to PPM 90–1, which describes the contents and format of impact statements, is attached as the Appendix to this opinion.

*Compare* E.D.F., et al. v. Corps of Engineers of United States Army, et al., 342 F.Supp. 1211 (E.D.Ark.1972) (opinion #6). The final revised impact statement submitted there was 200 pages long, and contained 1,150 pages of appendices. Moreover, unlike the impact statement in this case, the final impact statement was objective and not largely self-serving, ambiguous and self-contradictory.

*See also Guidelines for Preparation of Environmental Statements for Reviewing and Commenting on Environmental Statements Prepared by Other Federal Agencies (Preliminary)*, Environmental Protection Agency, Water Quality Office, Region X (1971), and H. Ray, *Reviewing Environmental Impact Statements at the Regional Level* (1972).

23. 458 F.2d 827 (D.C.Cir. 1972), 3 ERC 1558.

breadth of inquiry must be appropriate to the scope of the project. In other words, NEPA allows major federal action

> only following complete awareness on the part of the actor of the environmental consequences of his action and following his having taken the steps required by the Act.[24]

 Federal agencies

> . . . must not only observe the prescribed procedural requirements and actually take account of the factors specified, but . . . must also make a sufficiently detailed disclosure so that, in the event of a later challenge to the agency's procedure, the courts will not be left to guess whether the requirements of . . . NEPA have been obeyed.[25]

The requirement that the statement be detailed places a heavy burden on government agencies to gather for and include in the impact statement enough information to show that compliance has been genuine, not perfunctory.[26]

> . . . The subject of environmental impact is too important to relegate either to implication or to subsequent justification by counsel. The Statement must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned.[27]

 Without the detail required by NEPA, the court cannot ascertain whether the administrative action taken was arbitrary and capricious.[28] In such a case, the court should require a new impact statement. The only alternative would be for the court to hold endless hearings to consider the data available to the decision-makers, determine the reasoning they employed, and become thoroughly familiar with the studies they conducted. The courts should not, indeed, cannot become the forum for *de novo* review of what are essentially administrative decisions.

The "detailed statement" . . . should, at a minimum, contain such information as will alert the President, the Council on Environmental Quality, the public, and, indeed, the Congress, to all known *possible* environmental consequences of proposed agency action. Where experts, or concerned public or private organizations, or even ordinary lay citizens, bring to the attention of the responsible agency environmental impacts which they contend will result from the proposed agency action, then the [impact] statement should set forth these contentions and opinions, even if the responsible agency finds no merit in them whatsoever. Of course, the [impact] statement can and should also contain the opinion of the responsible agency with respect to all such viewpoints. The record should be complete. Then, if the decisionmakers choose to ignore such factors, they will be doing so with their eyes wide open.[29]

 The environmental impact study may not

> be used as a promotional document in favor of the proposal, at the expense of a thorough and rigorous analysis of environmental risks.[30]

 On the other hand, if the court were to rule that defendants must per-

24. National Helium Corp. v. Morton, et al., 455 F.2d 650, 656 (10th Cir. 1971).

25. Ely, et al. v. Velde, et al., 451 F.2d 1130, 1138 (4th Cir. 1971).

26. *Id.*, at 1139; E.D.F., et al. v. TVA, et al., 339 F.Supp. 806 (E.D.Tenn.1972), 3 ERC 1553.

27. Natural Resources Defense Council, et al. v. Morton, et al., 458 F.2d 827, 836 (D.C.Cir. 1972) (footnote omitted).

28. *Cf.* Citizens to Preserve Overton Park, et al. v. Volpe, et al., 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

29. E.D.F., et al. v. Corps of Engineers of United States Army, et al., 325 F.Supp. 749, 759 (E.D.Ark.1971) (opinion # 5).

30. Council on Environmental Quality Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements, 3 Environmental Reporter—Current Developments 82, 84 (May 19, 1972).

form all possible research on the environmental effects of the highway, the project could be postponed indefinitely, perhaps forever. Emotional environmentalism must be tempered with rational realism. Litigants must not be allowed to use NEPA as a tool to destroy federal programs under the guise of interest in the environment. While Congress has increasingly expressed concern for protection of the natural environment, it has also articulated a strong national policy to complete construction of interstate highways as soon as possible.

(b) It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

It is hereby declared that the prompt and early completion of the National System of Interstate and Defense Highways, so named because of its primary importance to the national defense and hereafter referred to as the "Interstate System", is essential to the national interest and is one of the most important objectives of this Act. It is the intent of Congress that the Interstate System be completed as nearly as practicable over the period of availability of the twenty years' appropriations authorized for the purpose of expediting its construction, re-

construction, or improvement, inclusive of necessary tunnels and bridges, through the fiscal year ending June 30, 1976, under section 108(b) of the Federal-Aid Highway Act of 1956 (70 Stat. 374), and that the entire System in all States be brought to simultaneous completion. Insofar as possible in consonance with this objective, existing highways located on an interstate route shall be used to the extent that such use is practicable, suitable, and feasible, it being the intent that local needs, to the extent practicable, suitable, and feasible, shall be given equal consideration with the needs of interstate commerce.[31]

■ The proper rule in highway cases is threefold: (1) Environmental studies must be conducted which reasonably comply with the spirit and letter of NEPA. (2) The information thus gathered must be analyzed and discussed in a reasonable manner in the draft impact statement. (3) The procedures for circulating, revising and processing the draft impact statement must strictly comply with the procedural requirements of NEPA.

The text of the impact statement filed in this case [32] is forty-three pages long, of which nineteen pages address the five subjects referred to in NEPA.[33] For the most part, the impact statement suffers from a serious lack of detail, and relies on conclusions and assumptions without reference to supporting objective data.[34] Federal reviewers could not

31. 23 U.S.C.A. § 101(b) (1972 Supp.).

32. Exhibit A–1, pp. 14–33.

33. 42 U.S.C.A. § 4332(2)(C)(i)–(v) (1972 Supp.).

34. For example, noise and air pollution are discussed in this manner:

The addition of three traffic lanes through this section of SR 90 is necessary to provide for the large volumes of traffic it is expected to handle. Therefore, it can also be expected that the amount of noise will also increase as the increased volumes of traffic make use of the highway. This increase in noise, however, should leave little or no

undesirable effects on the surrounding area. This is true because the rural character of the area renders it nearly free of permanent nearby human habitation. Further, noise is a long established occupant of this communications and transportation corridor. It is noteworthy, however, that the proposed project will disperse the noise level by separating the location of the eastbound and westbound roadways. During the construction of the project, a temporary increase in noise levels will occur as a result of operating construction equipment. Because of the remote area extraordinary methods to

have made an independent decision based on the information referred to, because the sources are not disclosed.

 The impact statement also suffers from a reliance on generalities and heavy-handed self-justifications. Defendants say that, "[j]ust as the old wagon road over Snoqualmie Pass was reclaimed by nature in less than 100 years, so would this project revert back to nature in time." [35] With respect to a seven-lane concrete highway this comment hardly comports with common sense, let alone objective research. Noise is said to have little effect on the area "because the rural character of the area renders it nearly free of permanent nearby human habitation."[36] There is nothing beyond the bare conclusion thus stated to prove either its truth or its falsity; moreover, it ignores the effects of noise on non-permanent human habitation—for example, on the campers and hikers who often use the area. Defendants continue, noting that the increased speed of traffic will decrease air pollution in the area.[37] There are vague references to studies, but again the statement relies entirely on generalities without specifically identifying even the source material on which it is based. Insufficient consideration was given to the effects of the highway on Denny Creek Campground and the surrounding areas, which include scenic points of interest and hiking trails. There is little discussion of the secondary effects of each alternative.[38] The discussion of the relationship between short-term uses and long-term productivity, and of irreversible commitments of resources, is so cursory that the entire text for both paragraphs covers one page.[39] Finally, the

---

reduce construction noise are not deemed appropriate.

Due to increased traffic through this area, a certain amount of increased vehicle exhaust emissions will also be generated.

Studies of vehicle operational characteristics show that the amount of emissions, hydrocarbons, oxides of nitrogen, and carbon monoxide from the exhaust of a vehicle will vary depending mainly on average speed and operating mode of its engine. Emissions of carbon monoxide and hydrocarbons are lower for higher average speeds. Although oxides of nitrogen stay stable or increase somewhat as speed goes up, the worst proportion of oxides of nitrogen and hydrocarbons, which produce smog, is found in conditions of freeway congestion at low speeds. The proposed project through this section of SR 90 has been designed to increase the average travel speed and reduce the existing congestion, thereby actually reducing the amount of total motor vehicle emissions, for comparable volumes of traffic which are most severe in low speed circumstances. The project will also aid in dispersing the auto emissions by separating the eastbound and westbound travel lanes by a considerable distance. During the construction of the project, an increase of air pollution levels within the valley will result from the operation of construction equipment.
Exhibit A–1, pp. 14–15.

35. Exhibit A–1, p. 32. *Compare* the comment in defendants' own brief of June 8, 1972, p. 8 at lines 10–11:
". . . there is no chance the [existing four-lane] highway will cease to pass nearby."

36. Exhibit A–1, p. 14.

37. Exhibit A–1, pp. 14–15.

38. CEQ Guidelines § 6(a)(ii) (April 23, 1971), 36 F.R. 7724; Calvert Cliffs' Coordinating Committee, et al. v. AEC, et al., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); H. Ray, Reviewing Impact Statements at the Regional Level 3–4 (1972).

39. Exhibit A–1, p. 32:
V THE RELATIONSHIP BETWEEN LOCAL SHORT-TERM USES OF MAN'S ENVIRONMENT AND THE MAINTENANCE AND ENHANCEMENT OF LONG-TERM PRODUCTIVITY
Since 1868 when the original wagon road over Snoqualmie Pass was built, it was realized that this crossing of the Cascade Mountain Range was the most feasible route to be taken. Since that time, continual increases in traffic over Snoqualmie Pass have required numerous improvements to the transportation facilities along this route. Today, the existing SR 90 roadway is but one of several transportation and

state's responses to comments received from circulating the impact statement seem to have been drafted without adequate thought. The state's reply to the most articulate comment it received was drafted the same day,[40] a rubber stamp procedure previously condemned by this court.[41]

■■■■■ NEPA requires each agency to undertake the research needed to adequately expose environmental harms.[42]

Thus, defendants are required to . . . identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations . . .[43]

Clearly, the "detail" must flow from research conducted according to the statute's mandate.[44] If defendants have access to studies already conducted which show the environmental effects of a sim-

communication facilities located within this corridor. SR 90 is rapidly approaching its maximum capacity and must be updated to meet the needs of its roadway users. In an attempt to facilitate this growing need, the Washington State Department of Highways has developed the project as presented in this report. This project provides an excellent transportation facility, within the corridor established in 1868, which will facilitate the increasing number of cross state travelers and also provide adequate access facilities to the rapidly increasing numbers of people desiring the recreational facilities of this area. The Forest Service is in the process of developing a comprehensive land use plan for the summit area. At this time the plan is oriented toward further recreational development of the area. By limiting the proposed improvements of SR 90 to this existing corridor, future generations will be able to plan for the best possible use of the vast undeveloped natural areas of the Cascade Mountains which lie outside of this corridor.

VI ANY IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RESOURCES

The project, as presented in this report, will have three westbound travel lanes along the north side of the upper Snoqualmie River Valley. This area is composed mainly of forest lands and slide areas. As the westbound lanes traverse the forested areas, a loss of timber resources will be realized within the roadway prism itself; however, trees will be permitted to remain within the right of way which lie outside the roadway prism. Although these trees which lie out-

side the roadway prism will remain, it should be noted that the Forest Service would not allow the harvesting of this timber because of its scenic value. The facility also traverses a large amount of slide area lying above the forested area. Traversing these slide areas avoids the forest areas below; but the facility will be more noticeable from the existing highway.

Construction materials required to construct the facility will be lost for any other purpose for the life duration of the highway. While it is true that certain resources may be lost for practical use in the foreseeable future, the great bulk of the project consists of reshaping the natural physiography, using native materials. Just as the old wagon road over Snoqualmie Pass was reclaimed by nature in less than 100 years, so also would this project revert back to nature in time. That lengthy natural reversion time could be greatly speeded by man, of course, through appropriate removal operations and reshaping, if for some reason the facility became obsolete.

40. The six-page letter from the Department of the Interior, appended to the impact statement, is dated April 4, 1972. The final impact statement was signed the same date, and approved by FHWA on April 5, 1972.

41. *See* Daly, et al. v. Volpe, et al., 350 F. Supp. 252 (W.D.Wash.1972), reh. 260.

42. E.D.F., et al. v. Hardin, et al., 325 F. Supp. 1401 (D.C.D.C.1971).

43. 42 U.S.C.A. § 4332(2)(B) (1972 Supp.).

44. *Cf.* CEQ Guidelines § 6(a)(i) and (iv) (April 23, 1971), 36 F.R. 7724.

ilar project under substantially identical conditions, then the detail can be supplied by referring to and summarizing from these studies. If no such information is available, then defendants must see to it that the necessary research is conducted.

. . . [D]efendants may already have made studies, investigations and analyses which would answer the Court's doubts as to their compliance with NEPA. On the other hand, they may wish to undertake, . . . additional studies or hearings in order to demonstrate that they have taken into consideration all significant ecological and environmental data related to this project, as required by law.[45]

Finally, defendants failed to give adequate public notice of the existence of the completed impact statement.[46] This is most likely the reason for the absence of comment thereon from the general public.[47] It is shocking that not even the plaintiffs in this lawsuit were so informed.

## III. The 4(f) Statement

Environmentalists have often charged that

. . . [i]n order to ensure the rapid completion of new highways, the utilization of apportioned funds, and the least cost in acquiring rights-of-way, state highway departments have selected routes along the path of least resistance, such as through parklands.[48]

To meet this problem, Congress amended section 4(f) of the Department of Transportation Act[49] to read:

(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23,

45. E.D.F., et al. v. Corps of Engineers of United States Army et al., 325 F.Supp. 728, 749 (E.D.Ark.1971) (Opinions ## 1–4).

46. Cf. Executive Order 11514, § 2(b) (March 5, 1970), 35 F.R. 4247, and CEQ Guidelines § 10(e) (April 23, 1971), 36 F.R. 7724.
Procedures for preparation and circulation of impact statements are now outlined in PPM 90–1, par. 6 (August 24, 1971). The impact statement submitted in this case states that it "was made available . . . to the public on February 23, 1972." Exhibit A–1, p. 4. Ordinarily, the impact statement is made available to the public prior to a public location hearing, PPM 90–1, par. 6c, and the public has notice of the hearing well in advance, PPM 20–8, par. 8 (January 14, 1969). In this case, of course, the state would be justified in using some kind of substitute procedure to inform the public, since location and design hearings had been held prior to the passage of NEPA. See the stipulation of the parties filed December 17, 1970. However,

the substitute procedure employed here effectively precluded public comment.

47. There are a few comments from the public which relate to the design and access hearing of December 9, 1969 mentioned in the stipulation of the parties filed December 17, 1970.

48. Comment, Favoring Parks Over Highways—A First Step Toward Resolving the Conflict Between Preservation of Environmental Amenities and Expansion of the Highway System, 57 Iowa L.Rev. 834, 858 (1972), citing Tippy, Review of Route Selections for the Federal-Aid Highway Systems, 27 Mont.L.Rev. 131, 135 (1966).

49. 49 U.S.C.A. § 1653(f) (1972 Supp.). The language is nearly identical to that in 23 U.S.C.A. § 138 (1972 Supp.). The legislative history of these two sections, and an explanation of the reasons for minor differences in language, may be found in Pennsylvania Environmental Council v. Bartlett, 454 F.2d 613, 621–622 (3d Cir. 1971).

1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.[50]

To fulfill his duties under this section, the Secretary of Transportation prepares what is commonly referred to as a "4(f) statement." [51]

The leading case on the purpose and adequacy of a 4(f) statement is Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The highway concerned in that case would have taken 26 acres of a 342-acre city park, and would have severed the zoo from the rest of the park. The Secretary announced in April, 1968, his concurrence with local officials that the highway be built through the park.

The Secretary did not make findings as to why no alternative route was feasible and prudent, and as to how all possible planning had been conducted to minimize harm to the park. In the district court, federal defendants produced affidavits to remedy these deficiencies, and opposing affidavits were introduced. The Supreme Court held that judicial review based solely on litigation affidavits was inadequate,[52] but that formal findings by the Secretary would not be required. The court went on to hold that section 4(f) bars "the use of federal funds for construction of highways through parks —only the most unusual situations are exempted." [53] In order to conclude that there is no feasible alternative,

> the Secretary must find that as a matter of sound engineering it would not be feasible to build the highway along any other route.[54]

 The "substantial evidence" rule is inapplicable, since agency action was not pursuant to a rulemaking provision of the Administrative Procedure Act or based on a public adjudicatory hearing. Nor is *de novo* review authorized. When it is unclear what information was before the Secretary, the proper method of review is to conduct a "substantial inquiry" into the Secretary's 4(f) determination.[55]

---

50. 49 U.S.C.A. § 1653(f) (1972 Supp.).

51. The content and format for 4(f) statements is outlined in PPM 90–1, Exhibit E, paragraph 3, which is appended to this opinion.

52. Citizens to Preserve Overton Park, Inc., et al. v. Volpe, et al., (Overton Park), 401 U.S. 402, 409, 91 S.Ct. 814, 820, 28 L.Ed.2d 136, 149 (1971).

53. *Id.* at 411, 91 S.Ct. at 821, 28 L.Ed.2d at 150.

54. *Id.* at 411, 91 S.Ct. at 821, 28 L.Ed.2d at 150.

55. *Id.* at 415–417, 91 S.Ct. at 823–824, 28 L.Ed.2d at 153–154. This inquiry is three-fold: (1) a determination that the Secretary acted within the scope of his authority, (2) a finding that the choice was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and (3) an inquiry whether the Secretary followed the necessary procedural requirements.

The district court, on remand, conducted further hearings that consumed 25 trial-days. The court concluded that the Secretary had in fact failed to act within the scope of his authority, and remanded the matter to the Secretary for a valid 4(f) determination. Citizens to Preserve Overton Park, Inc., et al. v. Volpe, et al., 335 F.Supp. 873 (W.D. Tenn.1972), 3 ERC 1510.

There can be no doubt that in the instant case the Secretary was required to make the necessary certification.[56] This the Secretary did, basing his decision on information supplied to him by the State of Washington, which in large part came from the environmental impact statement reviewed *supra*. For the same reasons that the impact statement was deficient, however, the court finds that the 4(f) statement was likewise inadequate.[57]

Plaintiffs admit that, "[u]nlike *Overerton Park*, where such inquiry [whether the Secretary acted within the scope of his authority] was not possible because of the lack of administrative record, this Court has the administrative record before it . . . in the combination final [environmental impact and] 4(f) statement."[58] However, plaintiffs contend, and this court agrees, that the Secretary could not have determined that there are no feasible and prudent alternatives—there were no firm cost projections given, no detailed analysis, no information about the "truly unusual factors"[59] present, and no proof of costs of extraordinary magnitude.[60]

## IV. Remedy

Unless there are strong equities to the contrary,[61] the general rule is that projects proceeding in violation of environmental statutes should be enjoined until the mandate of the law has been met.[62]

Some delay will be necessary, but it should be negligible, for this Court expects that [defendants] will assign a high priority to this case. . . .[63]

---

56. The court of appeals so held in Brooks, et al. v. Volpe, et al., 460 F.2d 1193 (9th Cir. 1972).

57. *See* Overton Park, *supra*, note 52; D.C. Federation v. Volpe, 459 F.2d 1231 (D.C.Cir. 1971).

58. Plaintiffs' brief of June 5, 1972 at 17, lines 13–16.

59. 49 U.S.C.A. § 1653(f) (1972 Supp.); 23 U.S.C.A. § 138 (1972 Supp.).

60. *Cf.* Harrisburg Coalition Against Ruining the Environment v. Volpe, et al., 330 F.Supp. 918 (M.D.Penn.1971).

61. *See, e. g.*, Environmental Law Fund, et al. v. Volpe, et al., 340 F.Supp. 1328 (N.D.Cal.1972); Greene County Planning Bd. v. FPC, et al., 455 F.2d 412, at 424–425 (2d Cir. 1972) ["no compelling basis for halting construction" of those power lines which were 80% complete]; Ragland v. Mueller, et al., 460 F.2d 1196 (5th Cir. 1972); Conservation Society of Southern Vermont, Inc., et al. v. Volpe, et al., 34 3F.Supp. 761 (D.Vt.1972). *Compare* Coalition for Safe Nuclear Power v. United States A.E.C., et al., 463 F.2d 954 (D.C.Cir. 1972), 3 ERC 2016.

62. *See, e. g.*, E.D.F., et al. v. Corps of Engineers of United States Army, et al., 325 F.Supp. 749 (E.D.Ark.1971) (opinion # 5); E.D.F. v. Corps of Engineers of United States Army, 331 F.Supp. 925 (D.C.D.C.1971); Morningside-Lenox Park Assn. v. Volpe, et al., 334 F.Supp. 132 (N.D.Ga.1971); National Helium Corp., et al. v. Morton, et al., 455 F.2d 650 (10th Cir. 1971); Scherr, et al. v. Volpe, et al., 336 F.Supp. 882 (W.D.Wis. 1971), on motion to suspend injunction 336 F.Supp. 886; Arlington Coalition on Transportation, et al. v. Volpe, et al., 458 F.2d 1323 (4th Cir. 1972); Named Individual Members of San Antonio Conservation Society, et al. v. Texas Hwy. Dept., et al., 446 F.2d 1013 (5th Cir. 1971), reh. and reh. en banc den. 446 F.2d at 1029, application for stay granted, 400 U.S. 939, 91 S.Ct. 231, 27 L.Ed.2d 262 (1970), stay vac. 400 U.S. 961, 91 S.Ct. 361, 27 L.Ed.2d 381.
 In Goose Hollow Foothills League, et al. v. Romney, et al., 334 F.Supp. 877 (D.Or.1971), motion for injunctive relief 334 F.Supp. 880 (1971), the court withheld imposition of an injunction for 90 days to allow time for compliance. The court noted, however, that the area would not suffer irreparable harm in the interim. Here, the threat of irreparable harm is imminent. Indeed, construction has proceeded so rapidly that plaintiffs may very well have no effective remedy.

63. *Harrisburg Coalition, supra* note 60 at 930 of 330 F.Supp. *See also* Greene County Planning Board v. FPC, et al., 455 F.2d 412 (2d Cir. 1972); and Civic Improvement Committee, et al. v.

Imposition of the stringent requirements of NEPA, long after a project has begun, may sometimes appear to be too harsh. Yet the statute was intended not only to serve the convenience of the public today, but to provide future generations with protection of their interests as well. If NEPA had been enacted ten years ago, Seattle would surely not now be scarred with I–5, the hideous concrete ditch that runs through the heart of the city.

NEPA has been the law of the land for two and a half years, and the complaint in this lawsuit was filed nearly two years ago. Yet defendants have stubbornly refused to comply with the letter and spirit of the law. From the record, this court can only conclude that they have determined to push this project through with as little research and analysis on its environmental effects as the courts will tolerate.

. . . [T]he Congress of the United States is intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work.[64]

On the first appeal of this case, the court of appeals ordered defendants to file an impact statement and 4(f) certification, and directed this court to enjoin further construction if defendants failed to comply within sixty days of the entry of the judgment of the court of appeals.[65] On May 8, 1972, the court of appeals extended time for compliance to June 15, 1972. The impact statement and 4(f) statement were filed as exhibits with this court June 12, 1972, the date this court took the present issues under submission. No injunction has been entered, nor have plaintiffs requested one pending decision herein.

This court is reluctant to immediately enjoin further construction of the segment of the highway involved because men and equipment are presently on the jobsite, a substantial amount of the damage to the environment appears to have already been done, much of the construction has already been completed, and the portion of the construction season remaining is short.[66] Nevertheless, this court has been mandated by the court to which it is responsible to enjoin further construction if there has not been full compliance with NEPA. Accordingly, defendants are directed to show cause on August 18, 1972, why further construction should not be enjoined until they have complied with the directives set forth herein.[67]

Volpe, et al., (W.D.N.C.1972), 4 ERC 1160, 1161 ["Major projects have been interrupted for lack of compliance with the law, even though a great deal of work had already been accomplished"], aff'd 459 F.2d 957 (4th Cir. 1972).

64. E.D.F., et al. v. Corps of Engineers of United States Army, et al., 325 F.Supp. 728, 746 (E.D.Ark.1971) (Opinions ## 1–4).

65. Brooks, et al. v. Volpe, et al., 460 F.2d 1193 (9th Cir. 1972).

66. Affidavit of H. W. Humphres, filed and dated June 8, 1972.

67. *Compare* City of N.Y., et al. v. United States, et al., 337 F.Supp. 150 (E.D.N.Y. 1972), where the court found that NEPA had been violated, but that equity required the court to allow defendants 90 days to determine whether the situation could be remedied.

# APPENDIX

United States Department of Transportation Federal Highway Administration Policy
and Procedure Memorandum 90-1
Appendix E (August 24, 1971)

Transmittal 202
August 24, 1971

PPM 90-1
Appendix E (Refer to
Paragraphs 6b and 6i)

ENVIRONMENTAL STATEMENTS -
CONTENTS AND FORMAT

1. Environmental statements and combination environmental/Section 4(f) statements (draft and final) shall have a title page similar to the examples attached to this Appendix.

2. The following sections, as a minimum, are to be covered in environmental statements:

 a. A description of the proposed highway improvement and its surroundings. The description should include the following type information: type of facility; length; termini; basic traffic data, including trips for the design year and anticipated new trips generated two years after completion of the highway section; right-of-way width (including existing ROW); lengths on existing and new location; major design features such as number of lanes, access control, location of bridges and interchanges, etc.; a general description of the surrounding terrain, existing land use and proposed land use (a map preferable), and other existing environmental features; existing highway facilities including their deficiencies; the need for the proposal; the benefits to the State, region, and community; an estimate of when the proposal will be constructed; and the current status of the proposal with a brief historical resume. Inventory of economic factors such as employment, taxes, property values, etc., should be included as appropriate. The description should also include any involvement with Section 4(f) land (Paragraph 3 of this Appendix). A vicinity map(s) shall be furnished which will show the proposed highway section and its relationship to surrounding natural and cultural features such as towns, lakes, streams, mountains, historic sites, landmarks, institutions, developed areas, principal roads and highways and similar features that are pertinent to a highway study. Detailed maps, sketches, pictures, and other visual exhibits should be used to show specific environmental involvements as necessary. Maps and layouts of the proposed highway/Section 4(f) land involvement should be sufficiently detailed to give a layman reviewer a reasonable understanding of the highway impact and proposed measures to minimize harm.

 b. The probable impact of the proposed development or improvement. The evaluation and discussion should specifically emphasize significant beneficial and detrimental environmental consequences upon the State or region or community, as appropriate, of building a new highway into or through an area, or modernizing the existing highway by upgrading and/or relocation.

 (1) This section, for instance, would discuss and evaluate the broad impacts on the area or region such as the problems relating to anticipated increase in urbanization or the probable impact of displacing people (if these are significant elements of the highway proposal). Efforts to minimize impact should also be discussed in broad items. For example, measures necessary to insure proper rehousing should be discussed rather than evaluating specific number of people displaced by different alternatives and other differences of the alternatives. The significant environmental impacts of alternative locations and, as appropriate, designs, including a "do nothing" alternative is a proper subject for discussion under "Alternatives" paragraph 2d of this Appendix.

 (2) Impacts upon the narrow band (i.e., about 1000 feet) adjacent to the highway may be included when significant to the whole of the region or community. However, the discussions under this section should address the probable significant impacts of the highway proposal (as opposed to individual alternative locations or designs) which might include the probable impact upon such elements, factors, and features listed in paragraph 3 of Appendix F.

 c. Any probable adverse environmental effects which cannot be avoided should the proposal be implemented such as water or air pollution, effect upon Section 4(f) land, damage to life systems, urban congestion, threats to health or other consequences adverse to the environment identified under paragraph 2b of this Appendix. Adverse effects should include those which cannot be reduced in severity and those which can be reduced (but not eliminated) to an acceptable level unless the reduction is a result of a different location in which case it should be included in the discussion of alternatives (paragraph 2d of this Appendix).

 d. Alternatives: The locations and/or designs studied in detail by the HA are to be described (narratively and with maps and other visual aids) and the probable beneficial and/or adverse effects of each alternate (including a do-nothing alternative) identified to the extent practicable consistent with the scale of the proposed highway improvement and significance of the impact. The exploration of alternatives should include an objective evaluation and analysis of estimated costs (social and transportation), engineering factors, transportation requirements, and environmental consequences. The description of alternatives will include information, as appropriate, similar to that suggested in Section A of this Appendix. The discussion of environmental impacts will include more detailed impacts for each alternative than the broad environmental consequences for the

[A6467]

corridor identified in paragraphs 2b and 2c of this Appendix. The draft environmental statement should indicate that all alternatives are under consideration and that a specific alternative will be selected by the HA following the public hearing. The final environmental statement will be prepared for the selected alternative. Unless the final statement is included in the location study report (design report when prepared and circulated during design study), the final statement should include a brief discussion of the data supporting the selected alternative. This section should also include a discussion of alternatives to the use of Section 4(f) lands.

e. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity. The short-term uses should be evaluated (construction, changes in traffic patterns, the taking of natural features such as trees, etc., and man-made features such as homes, churches, etc.) as compared to the long-term effects (foreseen changes in land use resulting from the highway improvement or other similarly related items that may either limit or expand land use, affect water, air, wildlife, etc., and other environmental factors).

f. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Highways require use of natural resources such as forest or agricultural land, however, these are generally not in sufficient quantity to be significant. The improved access and transportation afforded by a highway may generate other related actions that could reach major proportion and which would be difficult to rescind. An example would be a highway improvement which provides access to a nonaccessible area, acting as a catalyst for industrial, commercial, or residential development of the area.

g. Where unavoidable adverse environmental effects are encountered, planning and measures taken and proposed to minimize harm should be identified. These include procedural and standard measures which are required by standard specifications or standard operating procedures such as erosion control, stream pollution prevention, borrow pit screening or rehabilitation, fencing, relocation of people and businesses, land acquisition procedures, joint development, etc. Measures unique to a specific project should be discussed in detail. Examples of such would be depressing an urban highway to minimize audio and visual effects, providing buffer zones for esthetic purposes, replacement of parklands, etc.

h. Final statements shall incorporate all comments received on the draft (including environmental comments contained in the public hearing transcript) along with a discussion of the comments and suggestions. The HA shall describe its disposition of the comments and suggestions (e.g., revisions to the proposed development or improvement to overcome anticipated problems or objections; reasons why specific comments and suggestions could not be accepted; factors of overriding importance prohibiting the incorporation of suggestions, etc.). This section may be added at the end of the review process in the final text of the environmental statement.

i. Measures to minimize harm to Section 4(f) lands should be included under a separate paragraph even though discussed elsewhere in the final statement.

j. Each copy of draft and final environmental statements should be accompanied by a summary sheet prescribed as attached to this Appendix.

3. The following information, when pertinent and available, should be included in the combination environmental/Section 4(f) statements. (See paragraphs 2a, 2c, 2d, and 2i of this Appendix.) To the extent practicable, this information should be included in the draft to initiate the necessary interagency review.

a. The description of the project (see paragraph 2a of this Appendix) shall include information about the Section 4(f) land in sufficient detail to permit those not acquainted with the project to have an understanding of the relationship the highway and park and the extent of the impact, such as:

(1) Size (acres or square feet) and location (maps or other exhibits such as photographs, slides, sketches, etc., as appropriate).

(2) Type (recreation, historic, etc.)

(3) Available activities (fishing, swimming, golf, etc.).

(4) Facilities existing and planned (description and location of ball diamonds, tennis courts, etc.).

(5) Usage (approximate number of users for each activity if such figures are available).

(6) Patronage (local, regional, and national).

(7) Relationship to other similarly used lands in the vicinity.

[A6468]

(8) Access (both pedestrian and vehicular).

(9) Ownership (city, county, State, etc.)

(10) If applicable, deed restrictions or reversionary clauses.

(11) The determination of significance by the Federal, State, or local officials having jurisdiction of the Section 4(f) land.

(12) Unusual characteristics of the Section 4(f) land (flooding problems, terrain conditions, or other features that either reduce or enhance the value of portions of the area).

(13) Consistency of location, type of activity, and use of the Section 4(f) land with community goals, objectives, and land use planning.

(14) If applicable, prior use of State or Federal funds for acquisition or development of the Section 4(f) land.

b. A description of the manner in which the highway will affect the Section 4(f) land (include within paragraph 2c of this Appendix) such as:

(1) The location and amount of land (acres or square feet) to be used by the highway.

(2) A detailed map or drawing of sufficient scale to discern the essential elements of the highway/Section 4(f) land involvement.

(3) The facilities affected.

(4) The probable increase or decrease in physical effects on the Section 4(f) land users (noise, fumes, etc.).

(5) The effect upon pedestrian and vehicular access to the Section 4(f) land.

c. A specific statement (with supporting reasons) that there is·no feasible and prudent alternative. (Include in discussion of alternatives, paragraph 2d of this Appendix.)

d. Information to demonstrate that all possible planning to minimize harm is or will be included in the highway proposal. (See paragraph 2i of this Appendix.) Such information should include:

(1) The agency responsible for furnishing the highway right-of-way.

(2) Provisions for compensating or replacing the Section 4(f) land and improvements thereon, including the status of any

agreements. (Include agreed upon compensation, replacement acreages, and type land, etc., when known.)

(3) Highway design features developed to enhance the Section 4(f) land or to lessen or eliminate adverse effects (improving or restoring existing pedestrian or vehicular access, landscaping, esthetic treatment, etc.).

(4) Coordination of highway construction to permit orderly transition and continual usage of Section 4(f) land facilities (new facilities constructed and available for use prior to demolishing existing facilities, moving of facilities during off-season, etc.).

e. Evidence that the provisions of Section 470(f) of 16 U.S.C. (Section 106 of the Historic Preservation Act of 1966) have been satisfied when National Register Properties are involved.

[A6469]